SHAURETTE, Respondent, v. CAPITOL ERECTING COMPANY, Appellant.

*March 31—April 28, 1964.*

540

For the appellant there were briefs by *Kivett & Kasdorf,* attorneys, and *Nonald J. Lewis* and *James P. Reardon* of

counsel, all of Milwaukee, and oral argument by *Mr. Reardon*.

For the respondent there was a brief and oral argument by *Delbert E. Fowler* of Milwaukee.

DIETERICH, J.  On January 24, 1959, Bernard Shaurette was working as a "pot man" in the foundry at the Advance plant in Milwaukee. It was his job to melt metal in the furnace and pour it into a large pot or ladle, which was then conveyed to other machines in the foundry by an overhead monorail system. Shaurette was injured when a portion of the monorail fell upon him while he was at work.

The monorail system had been purchased by Advance in June, 1950, and was originally installed by Capitol at that time. In September, 1950, portions of the Advance building were destroyed by fire, and in March, 1951, Capitol re-erected the monorail system. The monorail consisted of a seven-inch I beam approximately 110 feet long, which was attached to the steel ceiling support beams, and suspended about 10 feet above the foundry floor. A "trolley" rode on the I beam, and a chain hoist was attached to the trolley. The ladle was suspended from the chain hoist, and was pushed manually back and forth from the furnaces to the die-casting machines.

Several persons who had been employed in the Advance foundry on the date of the accident were called as witnesses for the plaintiff. Byron J. Schmid, who was working about 100 feet away from Shaurette, testified that he heard the crash when the beam fell, and saw Shaurette lying on the floor. He also stated that the monorail track had broken away from the rail "from the welds." Thomas R. Olinger, another Advance employee, testified that he was only 15 feet away when the rail fell, that he did not believe the rail itself was broken, but that the rail had broken off "right at the welds."

The personnel manager at Advance, Melvin Gentz, testified that the several sections of rail are connected by a weld and reinforcement plates. When asked whether these connections came loose, Gentz stated that he did not believe so. After testifying that the sections of rail are welded to the supporting beam on the ceiling, Gentz was asked the following question:

"Q. And what happened to that? A. Well, that apparently come loose."

According to Gentz, Advance never made any alterations to the monorail system between 1951 and the date of the injury, although he testified that accumulation of oil and dirt on the rails occasionally caused bumps which were removed by Advance maintenance men when necessary.

Raymond Brengosz, a safety engineer employed by Advance's insurance carrier, testified that he made safety inspections at Advance on the average of four times a year. Brengosz stated that he inspected the monorail system after it had been rebuilt following the accident, and that there had not been any major change in design or manner of construction when the system was rebuilt.

Thomas L. Meyers, who was plant superintendent at the time of the accident, testified that the section of track which fell down was approximately 15 feet in length, and that the rail itself was not broken, although it had "pulled loose" and fallen down. When asked what had pulled loose, Meyers replied: "The weld, I imagine." He also testified that the hangers which had been supporting the fallen section of track "evidently had broken loose."

William Mervin, an employee of Thelen Erecting Company, who supervised the re-erecting of the monorail system after the accident, testified that the supporting hangers, which were butt-welded to the rail, had broken loose, and that the rail itself was not broken. Mervin was asked whether butt-welding was the usual and customary manner of attach-

ing the track to the hangers, and the question was objected to on grounds that the witness' opinion on the matter would be immaterial to the issues in the case. The trial court allowed Mervin to answer "for the purpose of a possible foundation," and Mervin stated that butt-welding was not common practice, and that generally a two-by-two clip is added to the assembly to give more welding surface and more strength.[1] Mervin also testified that the hangers used were "probably heavy enough," but that they "weren't properly attached to the rail." In rehanging the track, Mervin stated that he added the clips to the existing hangers and added additional sway bracing, which he felt was necessary because "the rail wasn't rigid enough."

The only witness called by the defendant was Edgar Burkhardt, a retired industrial commission investigator who investigated the Shaurette accident for the commission. Burkhardt was subpoenaed as a witness, but stated that he no longer had access to the records of his investigation. All he could recall on the stand was that he investigated the accident, and that to the best of his knowledge there had been no difficulty with the monorail in the eight years it was in operation prior to the accident.

The appellant Capitol raises two questions on this appeal: (1) Whether sec. 330.155, Stats., which was enacted after the action was commenced, operates so as to bar the plaintiff's action, and (2) whether there was any credible evidence to support the jury's findings relating to the liability of the defendant.

---

[1] At the conclusion of the trial, when counsel were making their motions in the judge's chambers, the judge stated in response to a motion to strike portions of Mervin's testimony, that the usual and customary manner of installing monorail systems is not material to the issues, and that the court will not permit any inferences to be developed from the testimony to the effect that it was not constructed in the usual manner. Nothing was said concerning Mervin's testimony in the trial court's instructions to the jury.

(1) *Whether sec. 330.155, Stats., bars the action.* Sec. 330.155 [2] is a new statute, which was enacted by the legislature on August 16, 1961, and was published on August 22, 1961, to become effective on August 23, 1961. The statute provides that no action for personal injuries arising out of the defective condition of an improvement to real property shall be brought against any person performing the designing, planning, or construction of such improvement more than six years after the performance of such services.

Capitol re-erected the monorail in the Advance building in March, 1951. Shaurette's injury occurred on January 24, 1959, and the action was commenced by service of summons and complaint on June 24, 1960. Capitol moved to amend its answer so as to set up sec. 330.155, Stats., as a bar to the action. The motion was made pursuant to sec. 269.44 which provides in part that: "The court may, at any stage of the action . . . before or after judgment, in furtherance of justice . . . amend any . . . pleading . . ." The motion was denied by order of the trial court dated January 7, 1963.

There is nothing in sec. 330.155, Stats., which would even remotely indicate that the legislature intended it to operate retroactively, and it is a cardinal rule of construction that even where statutes are ambiguous as to their retroactive effect, they are to be construed as relating to future and not to past acts. *Northern Supply Co. v. Milwaukee* (1949), 255 Wis. 509, 516, 39 N. W. (2d) 379, and cases there cited.

Capitol argues at length that sec. 330.155, Stats., is a remedial statute, and thus its retroactive application is not a

---

[2] Sec. 330.155 (ch. 412, Laws of 1961). "No action to recover damages . . . for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, . . . shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than 6 years after the performance of furnishing of such services and construction. . . ."

valid objection, relying primarily upon *Steffen v. Little* (1957), 2 Wis. (2d) 350, 86 N. W. (2d) 622. The *Steffen Case* involved a statutory provision for substituted service of summons and complaint upon the motor vehicle commissioner in automobile accident cases, and this court stated that (p. 357): "While statutes in general are construed prospectively the rule is otherwise with statutes whose operation is procedural or remedial." The *Steffen opinion* cites a Minnesota case [3] wherein an amendment extending a statute of limitations which had the effect of restoring to the plaintiff his remedy and divesting the defendant of the statutory bar to the plaintiff's action was held constitutional. However, we are not here concerned with the situation where retroactive application of legislation affecting a statute of limitations has the effect of extinguishing a plea in bar set up by the defendant, and restoring the plaintiff's remedy; the instant action involves retroactive application of a statute which would have the effect of denying the plaintiff his remedy after the action had been commenced.

In any event, the *Steffen Case* also recognizes an important qualification to the rule therein stated to the effect that retroactivity is not necessarily fatal to a remedial statute; and that qualification is that the retroactive application must not disturb vested rights. The rule was correctly stated in *State ex rel. Davis & Starr Lumber Co. v. Pors* (1900), 107 Wis. 420, 427, 83 N. W. 706, wherein this court quoted Chancellor Kent (1 Comm. 455) as follows:

" 'This doctrine [prospective construction of statutes only] is not understood to apply to remedial statutes, which may be

---

[3] *Donaldson v. Chase Securities Corp.* (1943), 216 Minn. 269, 13 N. W. (2d) 1. Affirmed on appeal to the United States supreme court (1945), 325 U. S. 304, 65 Sup. Ct. 1137, 89 L. Ed. 1628. For an effective discussion on the force and effect of the *Chase Case* in Wisconsin see *Haase v. Sawicki* (1963), 20 Wis. (2d) 308, 314–316, 121 N. W. (2d) 876.

of a retrospective nature, provided that they do not impair contracts or disturb absolute vested rights, and only go to confirm rights already existing and in furtherance of the remedy, by curing defects and adding to the means of enforcing existing obligations.' "

Capitol also argues that *Schultz v. Vick* (1960), 10 Wis. (2d) 171, 102 N. W. (2d) 272, is applicable to the instant action. We there held that the elimination of the notice-of-injury requirement of sec. 330.19 (5), Stats., did not violate a vested right of the defendants, but only established a legislative change in procedure. This was in keeping with prior holdings of this court that the notice-of-injury requirement was not a statute of limitations, but merely a condition precedent to the commencement of a personal-injury suit where the summons and complaint was not served within two years of the accrual of the cause of action. *Nelson v. American Employers' Ins. Co.* (1952), 262 Wis. 271, 55 N. W. (2d) 13, and cases therein cited. In any event, the opinion in the *Schultz Case* recognized that, in an automobile accident case, the substantive rights of the parties come into being at the time of the collision.

In Wisconsin the running of the statute of limitations absolutely extinguishes a cause of action. *Maryland Casualty Co. v. Beleznay* (1944), 245 Wis. 390, 393, 14 N. W. (2d) 177. See also *Haase v. Sawicki* (1963), 20 Wis. (2d) 308, 311, 312, 121 N. W. (2d) 876.

*New York Life Ins. Co. v. State* (1927), 192 Wis. 404, 211 N. W. 288, 212 N. W. 801, cited by Capitol in support of its argument that the action was barred by the enactment of sec. 330.155, Stats., is clearly distinguishable from the instant action. In that case the New York courts held prior rulings of the New York tax department erroneous, which holdings had the effect of barring the plaintiff's claim, and this court held that the plaintiff's action was barred. However, the New York decisions were handed down before the

plaintiff in the *New York Life Ins. Co. Case* had commenced the action; whereas in the case at bar, sec. 330.155 was not enacted until after Shaurette had commenced the action.

This court, in *Swanke v. Oneida County* (1953), 265 Wis. 92, 102–104, 60 N. W. (2d) 756, 62 N. W. (2d) 7, held that a statute shortening an existing limitation, and making it retroactive to existing causes of action, would be unconstitutional unless a grace period was granted within which persons, whose causes of action would be immediately barred by such change, were allowed a reasonable time in which to commence their actions. The *Swanke Case* involved a statute which shortened the time in which a minor may bring an action to redeem lands sold for delinquent taxes. The statute was held inapplicable to a minor plaintiff, although at the time of its enactment she had not yet commenced the action for redemption, but had tendered to the county all the necessary delinquent taxes, interest, penalties, and fees, and had made a demand for redemption.

While it is possible that existing causes of action may be affected by statutory amendments whereby procedural limitation periods are shortened or lengthened, the legislature has no power to interfere with vested rights of action after suit has been commenced.

We determine that the correct rule in situations such as the one presented on the instant appeal, is that a statute of limitations can under no circumstances operate retroactively to the extent of defeating actions and other proceedings which have been commenced prior to its enactment. See 34 Am. Jur., Limitation of Actions, p. 37, sec. 32. The plaintiff's cause of action arose under the common law, and was pending in the circuit court at the time the legislature created sec. 330.155, Stats., and it could not be taken away from him by the action of the legislature. The fact that plaintiff may have had a cause of action against his employer

under the Workmen's Compensation Act in no way affects the question of the applicability of the statute in the instant action.

(2) *Evidence to support the jury verdict.* The judgment of the trial court was entered upon the special verdict of the jury wherein it was found that Capitol was causally negligent in the manner in which it erected the monorail system. When the jury's findings are attacked, particularly when they have had the approval of the trial court, the question on appeal is limited to whether there is any credible evidence which, under any reasonable view, supports such findings. *Zimmerman v. Dornbrook* (1959), 6 Wis. (2d) 567, 95 N. W. (2d) 390.

Several Advance employees, who were present on the date of the accident and who viewed the scene shortly thereafter, testified at the trial. Byron J. Schmid testified that the rail itself was not broken, but that it had broken off "from the welds." Another employee, Thomas R. Olinger, testified that he did not believe that the rail itself had broken, but that it had broken off "right at the welds." Melvin Gentz, Advance's personnel manager, stated that the sections of rail are welded to the roof beam, and that this is where the break apparently occurred. Thomas L. Meyers, plant superintendent, testified that the rail, which was not broken, had "pulled loose," and that the hangers which had been supporting the fallen section of track "evidently had broken loose." When asked what had pulled loose, he replied: "the weld, I imagine."

The only witness called for the defense was a former industrial commission investigator who had investigated the accident, and whose testimony was only that he investigated the accident and that to his knowledge there had been no difficulty with the monorail system in the eight years it was in operation prior to the accident.

William Mervin, the man who supervised the reconstruction of the rail after Shaurette's injury, was called as a witness for the plaintiff. Mervin testified that his job is concerned with the erection of conveyors and monorail systems, and that he has had thirteen years of experience in the erecting business. He stated that the rail had broken loose from the supporting hangers, which were butt-welded to the rail. He testified over objection that butt-welding was not the common practice in erecting monorails; that the usual practice is to add clips in order to get more welding surface and consequently more strength; that in his opinion the hangers were not properly attached to the rail; and that the rail was not rigid enough. He also testified that in repairing the monorail, he reinforced the entire system, and added hangers and additional sway bracing.

Defendant's cross-examination of Mervin occupies a little over one page of the transcript, and is confined to questions of whether Mervin knew of the architect's plans and specifications prepared for the original installation of the system. Mervin answered that he was not aware that an architect had been involved in the original erection of the system, and that he had no way of knowing whether the original installation followed these plans or not.

Capitol contends that the trial court committed prejudicial error in allowing Mervin's testimony. Capitol's objections go to the following points: (1) Lack of evidence of Mervin's expertness; (2) lack of evidence of the tests he ran on the system as to stress, load, and wear capacity, etc.; and (3) even if Mervin were conceded to be an expert, his opinions were not based upon hypothetical facts.

The question of an expert witness' qualifications is a matter for the trial court, and unless it appears that the trial court has abused its discretion in this respect, his ruling will stand. Capitol did not object to Mervin's qualifications at

the trial, nor were there any objections to the questions as to how the rail had broken loose. The only objection was to Mervin's testimony as to whether butt-welding is the customary practice in erection of monorail systems. At one point, Capitol objected to a question of whether the supporting hangers were large enough, on grounds that it was beyond the scope of Mervin's qualifications. The trial court overruled the objection. We determine that the trial court did not abuse its discretion in allowing Mervin to testify as an expert. Mervin's testimony concerned the monorail and how it was hung, how it came loose, and how he repaired it. Mervin had substantial professional experience in monorail construction and erection. He personally observed the monorail system and supervised its repair after the accident.

The general rule, as stated in 82 A. L. R. 1338, is that when an expert witness has personal knowledge, or has had personal observation, and his opinion is sought, a hypothetical presentation is unnecessary, and he may be examined as an expert by direct interrogation. See *Feldstein v. Harrington* (1958), 4 Wis. (2d) 380, 391, 90 N. W. (2d) 566. Since Mervin had observed the monorail system, and had personal knowledge thereof, it was proper for the trial court to permit him to testify and give his opinion to a direct question without the use of a hypothetical question.

Capitol contends that upon the evidence in the instant action, the only inference a jury could possibly come to would be the inference that the rail had come down, and that any inference of negligent erection would be pure conjecture and speculation on the part of the jury. It is fundamental that the jury is not restricted to a consideration of the facts proved, even though they be undisputed; they may give effect to such inferences as reasonably may be drawn from the facts. *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 111, 62 N. W. (2d) 549, 63 N. W. (2d) 740. Nor is the jury expected to lay aside matters of common knowl-

edge or their own observation and experience of the affairs of life. On the contrary, they are to apply them to the evidence or facts at hand to the end that their action may be intelligent and their conclusions correct. *De Keuster v. Green Bay & W. R. Co.* (1953), 264 Wis. 476, 479, 59 N. W. (2d) 452. In the situation where several inferences may reasonably be drawn from credible evidence, one of which will support a claim of one of the parties and the other inferences will not, it is for the jury to determine the proper inference to be drawn from the evidence. *Maccaux v. Princl* (1958), 3 Wis. (2d) 44, 87 N. W. (2d) 772.

The jury was properly instructed as to proof of any negligence and we determine that there was sufficient credible evidence to support the jury's verdict, and therefore affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.