RABATA, Respondent, v. DOHNER and another, Appellants.

DOHNER and another, Appellants, v. GOVERNMENT EMPLOYEES INSURANCE COMPANY and another, Respondents.

*Nos. 119, 120. Argued October 28, 1969.—Decided December 2, 1969.*
(Also reported in 172 N. W. 2d 409.)

112

114

For the appellants there was a brief by *Aberg, Bell, Blake & Metzner* of Madison, and oral argument by *Carroll E. Metzner* and *Vaughn S. Conway* of Baraboo.

For the respondents there was a brief by *Francis R. Bannen* of Wisconsin Dells, and for the respondent David R. Rabata by *William H. McEssy* of Fond du Lac, and oral argument by *Mr. Bannen* and *Mr. McEssy*.

HEFFERNAN, J. There is really only one issue to be determined. That is, in whose lane the collision occurred.

Rabata testified that Dohner, proceeding from the east, drove his vehicle in a "baseball curve" that re-

sulted in a collision on Rabata's side of the road. Dohner testified that, although when he first saw Rabata he appeared to be in his proper lane, at the instant before the impact he realized that Rabata had invaded Dohner's lane.

Each of the parties produced witnesses who were admitted experts in the science of accident reconstruction. Professor Archie H. Easton, who was produced by the defendant, testified that the impact occurred in Dohner's lane of traffic. Harold Vik, an engineer and expert produced by the plaintiff, testified that the accident occurred in Rabata's lane.

Basically, the question is one of the credibility of the evidence, and it is obvious that the jury chose to believe Rabata and his expert witness. Were this the only point raised, we would be obliged to say, without further discussion, that this was a jury question and, since the jury has decided the issue adversely to the defendant, this court will not upset a decision based upon credible evidence.

The defendant also attacks the evidentiary standing of the testimony of Rabata and of his witness, Vik. He points out that the testimony of Rabata at the trial differed in important respects from that which he gave earlier at an adverse examination and was, therefore, completely impeached and incredible. He also concludes that the physical facts indicate that the accident could not have occurred in Rabata's lane of traffic and that, hence, the testimony of both Rabata and his expert is incredible. He further objects to Harold Vik's testimony, because he gave his opinion in regard to the point of impact without first being asked a hypothetical question.

Defendant's counsel points out the following discrepancies between the adverse examination and the trial testimony of Rabata. At the adverse examination, Rabata testified he never saw the Dohner car until it was 75

feet away; at trial he testified he saw the car when it was 750 feet away. In his adverse examination, Rabata testified he never saw the Dohner car over the center line; at trial he testified the Dohner car came over the center line in a big curve. In his adverse, Rabata testified the impact occurred in the intersection; at trial he testified it occurred east of the intersection. At the examination, Rabata testified the highway was clear and bare of snow or ice; at trial he testified the center of the road was covered with a ridge of snow.

An examination of the portions of the adverse examination which are incorporated in the record and the trial testimony shows that defendant's counsel is substantially correct in these assertions of discrepancies. It should also be pointed out, however, that there were also serious discrepancies between the defendant's adverse examination and that which he gave at trial.

Counsel for the defendant ably pointed out the internal conflict in the two versions of the accident testified to by Rabata. The jury could not help but be fully aware of the inconsistent evidence. We believe, however, that it is established in Wisconsin that, when conflicting evidence is pointed out to the jury, the weight to be given to the conflict and the determination of which version should be believed are matters for the finder of fact to resolve.

In the recent case of *Ianni v. Grain Dealers Mut. Ins. Co.* (1969), 42 Wis. 2d 354, 166 N. W. 2d 148, Isabelle Ianni, a passenger in the car, stated in a proof-of-loss statement nine months after the accident that the driver of the other vehicle had invaded her husband's lane of travel. At another time, she signed a statement in which she said she was asleep at the time of the accident. Her statements were attacked on the basis that the version of the accident given at trial was incredible and fabricated because of the inconsistency with the earlier statements. We affirmed the jury's finding of negligence, stating:

"The jury may elect to believe the witness-stand account of what happened, and disregard the earlier inconsistent statement of the witness. The jury may choose to believe the truthfulness of the earlier statement, and discount entirely the account presented from the witness stand. The jury may conclude that the inconsistencies revealed in trial and pretrial statements of a witness completely erode his credibility, and give no weight to either statement. To the contention that this gives to the jury a power to pick and choose between conflicting statements, the answer is that such authority is at least in the hands of those who have the opportunity to observe the witness, his demeanor, manner of testifying, hesitancies and similar nuances in speaking. An appellate court has only the cold, hard type of a printed record before it, and is in a poorer position to determine which statement has the ring of truth or whether all statements are to be considered counterfeit." *Ianni, supra,* at page 361.

In this case, Rabata was skillfully cross-examined by the defense counsel, and his inconsistencies were glaringly revealed, yet the jury apparently chose to believe Rabata's trial version of the accident. Under the rationale of the *Ianni Case,* this court will not arrogate to itself the power to declare that the trial testimony was incredible as a matter of law and could not be believed.

Defendant also asserts that the testimony of Rabata and his expert witness, Vik, is incredible because the testimony at trial revealed that the debris from the accident was found on Dohner's side of the road. From this testimony, the defendant, Dohner, reasons that the conclusion is inescapable that the accident occurred on Dohner's side of the road. We find no testimony of record that such a conclusion indisputably follows. True, defendant's expert witness, Professor Easton, testified that he, in part, based his conclusion that the accident occurred on Dohner's side of the road from the fact that he had been told the debris had been found there. Harold Vik, the plaintiff's expert, did not base his conclusion upon location of the debris, although he stated that the

position of the debris on the road was a factor to be considered in determining the point of impact. We know of no undisputed scientific fact that leads inevitably to the conclusion that the position of the debris necessarily determines the point of impact.

The Rabata automobile was traveling at a greater speed than Dohner's. This conceivably could account for the debris coming to rest on Dohner's side of the median strip rather than on Rabata's, irrespective of where the impact took place. We know of no scientific fact of which this court can take judicial notice that supports the contention of the defendant. If such fact exists, it has not been brought to our attention, and it can hardly be said that the defendant's theory is one that must be accepted as a matter of common knowledge.

This case is unlike *Strnad v. Co-operative Ins. Mut.* (1949), 256 Wis. 261, 40 N. W. 2d 552, which is relied upon by the defendant. In that case the physical facts established the testimony of Strnad to be incredible. In the *Strnad Case,* there were tire marks, gouges in the pavement, and splashes of oil, which, in the eyes of the trial judge and of this court on review, showed conclusively the point of impact and the direction of the Strnad automobile. On the basis of these physical facts, this court concluded that the testimony of Strnad that Meleski invaded Strnad's lane of the road was incredible.

We have no such unequivocal evidence here and are, accordingly, obliged to rely upon the jury's determination of the credibility of the witnesses. The defendant produced Professor Archie Easton, who testified that, on the basis of a hypothetical question and on the basis of information gleaned from his own investigation, the impact occurred on Dohner's side of the road. He testified, on behalf of Dohner, that he had examined the scene of the accident on July 27, 1967, over two and one-half years after the accident, and again on July 16, 1968, three and one-half years after the accident.

He also examined the frames of the vehicles (the tires and the sheet metal work having been removed) on July 27, 1967, and on August 1, 1967. He also studied the police photographs of the scene taken shortly after the accident while the automobiles were still in their immediate post-accident position. In addition, a lengthy hypothetical question was put to Professor Easton. It included as assumptions all of the facts that were in evidence regarding the accident. On the basis of his post-accident investigation and the facts assumed in the hypothetical question, Easton stated that the impact occurred in the westbound or north lane of the road, the lane of traffic for Dohner. He disputed Rabata's contention that Dohner's automobile had swung into Rabata's at an angle like a "baseball curve" and stated that both vehicles were traveling approximately straight ahead.

Rabata's attorney called Harold Vik, who testified that he had been retained by Rabata's counsel a few weeks after the accident, that he had then viewed the scene, had examined the vehicles, and had photographed them prior to the time that any parts had been scavenged. He stated that he had also studied the police photographs that had been placed in evidence showing the road conditions at the time of the accident and the position of the cars. Counsel for Rabata then asked Vik the following questions:

"Q. Now, Mr. Vik, based on your education and on your training and experience of reconstruction of automobile accidents, and based upon the police pictures, and your examination of the vehicles, and the other pictures which are in evidence here in this case, do you have an opinion as to how this accident occurred?

"A. I do.

"Q. Will you state that opinion as to the position of the vehicles at impact, and what if any opinions you have as to speed of the vehicles?"

Opposing counsel objected on the grounds that the question was not in hypothetical form and that no sufficient foundation had been laid. The following exchange then took place:

"*The Court:* All right. It seems to me, Mr. Bannen, that you should establish through this witness that he has some background knowledge of the alleged facts in this case before you proceed to have him give his opinions.

"*Mr. Bannen:* Your Honor, I don't want to ask him a hypothetical question.

"*The Court:* I wasn't requiring you to. I think you ought to at least attempt to establish that he has some knowledge of the general testimony that has been involved here.

"*Mr. Conway:* He wasn't present at the time of the occurrence.

"*The Court:* No, I know.

"*Mr. Conway:* He proposes to put something on this scale drawing for which there is no foundation.

"*Mr. Bannen:* I'm asking him from the physical facts, your Honor.

"*Mr. Metzner:* Then the objection goes to the ground that the physical facts produced up to this time by this witness are inadequate—grossly inadequate—on which to lay a foundation.

"*Mr. Bannen:* I think that should be brought out on cross-examination.

"*The Court:* I think, Mr. Bannen, you should show, briefly—and I'm not going to spend too much time on this—but I think you should show briefly that this witness at least has some factual knowledge of the testimony that has been brought out here relative to directions and so forth.

"*Mr. Bannen:* Q. Well, you were present when Mr. Rabata testified, were you not?

"*The Witness: A.* I was.

"Q. And you heard his testimony as to the directions of the automobiles?

"*A.* Yes.

"*Mr. Bannen:* I would like to ask my questions now, your Honor.

"*Mr. Conway:* We would renew our objection that there isn't a foundation for this witness—
"*The Court:* Well, go ahead, Mr. Bannen."

Mr. Vik proceeded to give his opinion that Dohner had invaded Rabata's lane of traffic at the time of the accident. He was exhaustively cross-examined as to the basis of his conclusion and what facts he had considered in arriving at the conclusion and how those facts had been determined. Under cross-examination, Vik conceded that the location of debris had not been considered in determining the point of impact; and when asked whether this was an important factor in determining a point of impact, he stated, "We like to know about debris, if there is anything to know about it."

The defendant on this appeal contends that the court erred in allowing Harold Vik to testify on an ultimate issue of fact without a hypothetical question. We do not agree. It is well-established law in Wisconsin that an expert may give an opinion in answer to a direct, as contrasted to, a hypothetical question, where the facts upon which he relies are either undisputed or are the result of firsthand knowledge. This is the case here.

In the instant case, Vik had firsthand knowledge as a result of his own investigation of the condition of the vehicles following the accident, the position where they came to rest after the collision, the condition and terrain of the intersection. He, in addition, relied on undisputed facts in evidence, such as the direction in which each car was proceeding and that there was a snowy ridge near the center line.

The appellant relies upon the language of *Kreyer v. Farmers' Co-operative Lumber Co.* (1962), 18 Wis. 2d 67, 76, 117 N. W. 2d 646, recently cited with approval in *Kreklow v. Miller* (1967), 37 Wis. 2d 12, 22, 154 N. W. 2d 243: ". . . the rule is that an expert may give an opinion on an issue of ultimate fact but only on a hypothetical question."

An examination of *Kreyer* indicates that the rule given, although correct, was applicable only where the facts relied upon were in dispute. *Kreyer* quotes *Maitland v. Gilbert Paper Co.* (1897), 97 Wis. 476, 484, 72 N. W. 1124, wherein, in an opinion written by Mr. Justice MARSHALL, this court said:

"Where evidentiary facts, upon which the fact in issue depends, are in *dispute*, opinion evidence as to the ultimate fact must be given upon a hypothetical case." (Emphasis supplied.)

The rationale heretofore accepted, that requires a hypothetical question where the facts are in dispute, is clear. A jury should not accept an opinion based on premises that are contested and whose truth must be ultimately decided by the jury. It is therefore necessary, where the underlying facts are in dispute, that the jury know at some time what these assumed facts are, so that the opinion itself may be rejected if the jury chooses to disbelieve the facts upon which it is based. As Wigmore stated:

". . . The key to the situation, in short, is that there may be two distinct subjects of testimony,—premises, and inferences or conclusions; that the latter involves necessarily a consideration of the former; and that the tribunal must be furnished with the means of rejecting the latter if upon consultation they determine to reject the former, *i.e.* of distinguishing conclusions properly founded from conclusions improperly founded." 2 Wigmore, *Evidence* (3d ed.), *Testimonial Qualifications*, p. 793, sec. 672.

The Wisconsin court has long followed this rationale. In *Shaurette v. Capitol Erecting Co.* (1964), 23 Wis. 2d 538, 550, 128 N. W. 2d 34, Mr. Justice DIETERICH, speaking for the court, stated:

"The general rule, as stated in 82 A. L. R. 1338, is that when an expert witness has personal knowledge, or has had personal observation, and his opinion is sought, a

hypothetical presentation is unnecessary, and he may be examined as an expert by direct interrogation."

This statement was quoted with approval in *Dewing v. Cooper* (1967), 33 Wis. 2d 260, 268, 147 N. W. 2d 261, wherein this court approved testimony by a doctor who performed the autopsy with respect to the cause of death. *See also Fehrman v. Smirl* (1963), 20 Wis. 2d 1, 121 N. W. 2d 255, 122 N. W. 2d 439; *Fehrman v. Smirl* (1964), 25 Wis. 2d 645, 131 N. W. 2d 314. Wisconsin has consistently followed the rationale that an expert may give an opinion in response to a direct question when that opinion is based upon facts that are undisputed or are within his firsthand knowledge.

We should also point out that there is no objection in Wisconsin to an expert giving his opinion on an ultimate fact. In *Henthorn v. M. G. C. Corp.* (1957), 1 Wis. 2d 180, 190, 83 N. W. 2d 759, we pointed out that the trial court erred in sustaining objections to questions asked of a trial witness based on the ground that they invaded the province of the jury. We therein stated:

"We do not consider it would be error to permit a qualified expert, such as Vik, to state his opinion as to the position of the two units at the time of impact based upon such facts as damage to the vehicles, position of the units after the accident, and marks, or absence of marks, on the pavement and shoulders."

In *Dewing v. Cooper, supra,* page 268, we stated:

". . . this court has held that opinions, if based upon proper questions, are not objectionable because they cover one of the ultimate facts to be determined by the jury."

Legal writers in the field of evidence are unanimous in their condemnation of the shibboleth of excluding evidence on the theory that it "invades the province of the jury." Charles T. McCormick, writing in 23 Texas Law Review, *Some Observations Upon the Opinion Rule and Expert Testimony* (1944–1945), p. 109, at 117, stated:

"The reason is sometimes given that such testimony 'usurps the functions' or 'invades the province' of the jury. Obviously, these expressions are not intended to be taken literally, which would render them absurd, but merely to suggest the danger that the jury may forego independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness.

"It is believed, however, that this general rule is unduly restrictive, is pregnant with close questions of application, and often unfairly obstructs the party's presentation of his case. Even the courts which profess adherence to the rule fail to apply it with consistency. All such courts, for example, disregard the supposed rule, usually without explanation as to why it should not be applied, when value, sanity, handwriting and identity are in issue."

McCormick points out that the realistic standard to be used is that "such opinions are to be admitted whenever they are calculated to aid the jury appreciably in reaching a right conclusion." Texas Law Review, *supra*, pages 118, 119. He pointed out, however, that a court, even though not banning opinions on an ultimate issue, might nevertheless properly condemn a question phrased in terms of a legal criterion which could be misunderstood by the laymen on the jury. Such questions as, "Did X have sufficient mental capacity to make a will," or "Was X negligent," would properly be condemned on this basis—that they would confuse the jury rather than assist it—and be excluded from evidence. This exclusion would be proper under the rule adopted in *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557, and followed in *State v. Hutnik* (1968), 39 Wis. 2d 754, 159 N. W. 2d 733. In those cases we adopted Rule 303 of the Model Code of Evidence, which permits a trial judge in his discretion to exclude otherwise admissible evidence when he concludes that the value of the testimony is outweighed by a substantial danger of undue prejudice or may result in confusion of the issues or mislead the jury.

7 Wigmore, *Evidence* (3d ed.), p. 17, sec. 1920, also attacks the supposed rule that an opinion should not be permitted which "usurp[s] the functions of the jury." He states:

". . . the phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric. There is no such reason for the rule, because the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function; nor could he if he desired. He *is not* attempting it, because his error (if it were one) consists merely in offering to the jury a piece of testimony which ought not go there; and he *could not* usurp it if he would, because the jury may still reject his opinion and accept some other view, and no legal power, not even the judge's order, can compel them to accept the witness' opinion against their own."

2 Wigmore, *Evidence* (3d ed.), p. 795, sec. 673, follows the same rationale in attacking the premise that the use of a hypothetical question avoids "usurp[ing] the function of the jury." He states:

"This bugbear, vigorously denounced with sentimental appeals to the value of jury trial, has been made to serve again and again as the dreadful source of those evils which the hypothetical question enables us to avoid . . . . That there is no hidden danger to the jury system, and no need of invoking rhetoric in its aid, will be seen when it is remembered that the logical necessity for hypothetical questions is exactly the same for a judge sitting without a jury. Whatever the tribunal, it must separate premises from conclusions, and it must wait till the end of the trial and all the evidence on both sides is in, before it determines what premises are proved and therefore which opinions have a factual basis.
"The 'usurpation' theory . . . has done much to befog bench and bar, and to assist in producing some of the confusion which attends the precedents."

It is apparent that a qualified expert may, in a proper case in response to a direct question, give his opinion on ultimate fact exactly as he can when the hypothetical question is posed. The test to be applied is not to be

determined upon the specious issue of whether the opinion given invades the province of the jury.

This point was recently discussed in *Jacobson v. Greyhound Corp.* (1965), 29 Wis. 2d 55, 138 N. W. 2d 133. Therein we reviewed Wisconsin cases and quoted with approval *Anderson v. Eggert* (1940), 234 Wis. 348, 361, 291 N. W. 365, stating:

" ' "Whether the testimony was properly received in this case depends upon whether members of the jury having that knowledge and general experience common to every member of the community would be aided in a consideration of the issues by the testimony offered and received." ' "

If opinion evidence is properly qualified as expert opinion, there is no objection to receiving in evidence an opinion in respect to an ultimate fact that must be decided by the jury.

The newly Proposed Rules of Evidence for the United States District Courts (46 Federal Rules Decisions 161) also permit opinion testimony on an ultimate fact. The proposed rule is stated:

"Rule 7–04.   **Opinion on Ultimate Issue**

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." (p. 317.)

In the instant case, the attorney for the plaintiff Rabata refused to use a hypothetical question in examining the reconstruction expert, Harold Vik. He was invited to do so and stated that he did not wish to ask a hypothetical question. He stated that defense counsel could, if he wished, explore the background premises by cross-examination. On the other hand, counsel for the defendant, in eliciting the opinion of Professor Archie Easton in regard to where the collision took place, propounded a lengthy hypothetical question which covered almost four pages of the transcript and took several

minutes to state. The question propounded by defense counsel is an example of an impeccably tailored hypothetical question. The points at issue, which at that time had not been proved, were stated as assumptions, and all the facts assumed that were material to answering the hypothetical question were clearly spelled out. Factual points involving the location of the accident, the type of vehicles, the direction in which the vehicles were traveling, the nature of the surface of the highway, the weather conditions, the type and condition of the tires on the vehicles, the speed of the vehicles, the grade of the road, the nature of the surface of the intersecting road, the number of passengers in each vehicle, the assumed conduct of the drivers in respect to brake application and maneuvers to avoid the accident, the position in which the automobiles came to rest, the nature and exact location of the debris on the highway, the damage to the vehicles, the effect of the position at which the vehicles came to rest upon the ability of traffic to proceed on the road, etc., were all set forth meticulously in the question.

In response to the question propounded to the defendant's reconstruction expert, Professor Easton unequivocally stated that he had an opinion. He pointed out that, in his opinion based on these assumed facts, the accident took place in Dohner's lane of traffic. The jury, however, apparently gave more weight to Rabata's expert, who expressed his opinion in response to a direct question, than they did to Dohner's witness, who answered only after being propounded a lengthy hypothesis.

This court is of the opinion that the use of a hypothetical question frequently has a stultifying, somniferous, effect upon a jury and presents to them at one time so great a quantity of assumed facts that it is not reasonable to expect them to have any clear idea of the basis on which the opinion is formed.

Moreover, the members of this court, based on their experience gleaned as practicing lawyers and trial judges, are satisfied that a mechanistic hypothetical question has the effect of boring and confusing a jury. Rather than inducing a clear expression of expert opinion and the basis for it, it inhibits the expert and forecloses him from explaining his reasoning in a manner that is intelligible to a jury.

The question is therefore posed in this case whether this court should require as a matter of general rule that the opinions of an expert should be elicited by hypothetical questions in those cases where they have heretofore been required. It was apparent herein that the very skilled trial counsel for Dohner believed, and he had good reason to believe, that the safe and proper procedure to use was to question Professor Easton by the use of a hypothetical question.

Almost all courts which have approached the subject have concluded that the hypothetical question, although logically a useful method of separating the premises from the conclusions, is potentially, and in actuality, a dangerous device which can lead to slanted questions, jury fatigue, and obfuscation of the facts. They have usually attempted to eradicate these inherent vices by setting up, on a case-by-case basis, elaborate rules detailing what facts should be included in a hypothetical question and setting forth exceptions to the rule requiring their use.

It is apparent that such tinkering with the hypothetical-question rule has not solved the problems.

McCormick has pointed out that courts throughout the country have attempted to limit the complexities of hypothetical questions by requiring, as Wisconsin has done, that only *material* facts be embraced in the hypothesis. He points out, however:

". . . this seems undesirable as likely to multiply disputes as to the sufficiency of the hypothesis, and as

tending to cause counsel, out of abundance of caution, to propound questions so lengthy as to be wearisome and almost meaningless to the jury." McCormick, *Evidence* (hornbook series), pp. 31, 32, sec. 14.

Despite the valiant attempts of courts to overcome the inherent vice of the hypothetical question, they have been far from successful, and legal writers who have addressed themselves to the problem have been almost unanimous in advocating their elimination. Judge LEARNED HAND, in the New York Bar Association "Lectures on Legal Topics," 1921–22, stated:

"May I also, in passing, hold up to you a prize of great value, the abolition of the hypothetical question,—the most horrific and grotesque wen upon the fair face of justice?"

2 Wigmore, *Evidence* (3d ed.), pp. 812, 813, sec. 686, gives that learned authority's appraisal of the future of the hypothetical question. He writes:

"Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justice HOLMES' phrase) is much more than Logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of Evidence, should have become that feature which does most to disgust men of science with the law of Evidence.

"The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth. In the first place, it has artificially clamped the mouth of the expert witness, so that his answer to a complex question may not express his actual opinion on the actual case. This is because the question may be so built up and contrived by counsel as to represent only a partisan conclusion. In the second place, it has tended to mislead the jury as to the purport of actual expert opinion. This is due to the same reason. In the third place, it has tended to confuse the jury, so that its employment becomes a mere waste of time and a futile obstruction.

"No partial limitation of its use seems feasible, by specific rules. Logically, there is no place to stop short; practically, any specific limitations would be more or less arbitrary, and would thus tend to become mere quibbles.

"How can the extirpating operation be performed? By exempting the offering party from the *requirement* of using the hypothetical form; by according him the *option* of using it,—both of these to be left to the trial Court's discretion; and by permitting the opposing party, *on cross-examination,* to call for a hypothetical specification of the data which the witness has used as the basis of the opinion. The last rule will give sufficient protection against a misunderstanding of the opinion, when any actual doubt exists.

"The foregoing proposals, be it understood, represent a mere practical rule of thumb. They do violence to theoretical logic. But in practice they would produce less actual misleading of the jury than the present complex preciosities. After all, the only theoretical object of the hypothetical question (*ante,* sec. 672) is to avoid misunderstanding; and 'if the salt have lost its savor, wherewith shall it be salted? It is thenceforth good for nothing but to be cast out and trodden under foot of men.' The present proposal does not tread under foot the hypothetical question, but merely transfers its function to the hands of the cross-examiner."

McCormick, *Evidence* (hornbook series), p. 33, sec. 16, discusses the same point. He states:

"The hypothetical question is an ingenious and logical device for enabling the jury to apply the expert's scientific knowledge to the facts of the case. Nevertheless, it is a failure in practice and an obstruction to the administration of justice. If we require that it recite all the relevant facts, it becomes intolerably wordy. If we allow, as most courts do, the interrogating counsel to select such of the material facts as he sees fit, we tempt him to shape a one-sided hypothesis. Those expert witnesses who have given their views seem to agree that this partisan slanting of the hypothesis is the fatal weakness of the practice. The legal writers who have studied the problem seem equally agreed in condemnation. What is the remedy? It seems hardly practicable to require the trial judge to undertake such a preliminary

study of the case as would be necessary to enable him to make the selection of the significant facts to be included. It would probably be feasible for such questions to be framed by both counsel in conference with the judge, either at a pre-trial hearing or during the trial, with the jury excluded. But this is wasteful of time and effort. The only remaining expedient is the one generally advocated, namely, that of dispensing with the requirement that the question be accompanied by a recital of an hypothesis, unless the proponent elects to use the hypothetical form, or unless the trial judge in his discretion shall require it. It will be for the cross-examiner to bring out if he so desires, the bases for the expert's opinion. Manifestly, this does not lessen the partisanship of the question or the answer, but it does greatly simplify the examination, and removes the occasion for imperiling the judgment by mistakes in the form of hypothetical questions."

In recent years the requirement that a hypothetical question be used to secure an expert opinion has been abandoned in California, Kansas, New Jersey, and New York. Deering's California Codes, *Evidence*, pp. 146–149, secs. 801 and 802; 4 Kansas Statutes Annotated, *Rules of Evidence*, p. 525, secs. 60–456 and 60–458; 2A:84A New Jersey Statutes Annotated (1969–1970 Pocket Supplement), *Rules of Evidence*, Rules 56 and 58, pp. 92, 93; (1969 Rules Manual, pp. 769, 770); 7B McKinney's, Consolidated Laws of New York, *Civil Practice Law and Rules*, p. 404, Evidence, sec. 4515. The proposed Federal Rules of Evidence (46 Federal Rules Decisions 161) dispense with the requirements of hypothetical questions and state the new rule thus:

"**Rule 7–03   Opinion Testimony by Experts**

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (p. 315.)

The philosophy expressed by Wigmore and McCormick has also been codified in Rule 409 of the *Model Code of Evidence,* and we accept that rule as one properly to be applied in trial matters, both civil and criminal, in the courts of Wisconsin and in the discretion of the trial judge. That rule provides:

"An expert witness may state his relevant inferences from matters perceived by him or from evidence introduced at the trial and seen or heard by him or from his special knowledge, skill, experience or training, whether or not any such inference embraces an ultimate issue to be decided by the trier of fact, and he may state his reasons for such inferences and need not, unless the judge so orders, first specify, as an hypothesis or otherwise, the data from which he draws them; but he may thereafter during his examination or cross-examination be required to specify those data." (pp. 210–211.)

We believe that this rule makes sense and would avoid the dilemma in which counsel for the defendant obviously found himself when he thought it necessary to propound a lengthy hypothetical question. It also preserves the right of counsel to use a hypothetical question if he considers it the best method of securing an expert opinion and it gives to the trial judge the authority to require a hypothetical question if direct questioning is not likely to be helpful to the jury. The rule, of course, assumes that the witness is an expert and is competent to qualify as such. It does not contemplate any change in our existing Wisconsin practice for the proper qualification of a witness who, in the sound discretion of the trial judge, may or may not be accepted as an expert. It does contemplate that the complete foundation for the opinion need not be put to the witness by hypothesis or otherwise prior to eliciting the opinion. This was the position taken by Judge GOLLMAR in the instant case when he allowed the opinion of Harold Vik without a hypothetical question and also permitted the defense attorney an unlimited opportunity in cross-examination

to test the foundation upon which the opinion was based.[1] This cross-examination was skillfully conducted by defense counsel and pointed out lacunae in the foundation upon which Harold Vik's opinion was based. For example, cross-examination forced an admission that Vik had not taken into consideration the location of the debris on the highway and that the location of such debris was a matter that should be considered when it is available. There is no obligation on counsel on cross-examination of an expert to elicit premises for the opinion that would damage the cross-examiner's position. He need not prove that his adversary's witness had a sound basis for his opinion.

Of course, it is within the discretion of counsel eliciting the opinion to use a hypothetical question if he so desires; but under the rule which we herein adopt, he will no longer be forced to do so if the use of such question, in his opinion, is likely to dull the effect of the point at issue. The trial judge, however, when he feels that the propounding of the question without a clear statement of the assumptions upon which it is based would confuse rather than aid the jury, may in his discretion insist that a hypothesis be used. He may also, of course, insist that some foundation be put in the record if he believes that the elicitation of an opinion without a

---

[1] The trial lawyer's ability to prepare to cross-examine his adversary's expert witness is, of course, dependent to a large degree upon his diligence in pursuing the pretrial discovery procedures that are available in Wisconsin. *See State ex rel. Reynolds v. Circuit Court* (1961), 15 Wis. 2d 311, 322, 323, 324, 112 N. W. 2d 686, 113 N. W. 2d 537, in regard to pretrial examination of the adversary's experts, and *State ex rel. Dudek v. Circuit Court* (1967), 34 Wis. 2d 559, 597 ff., 150 N. W. 2d 387, re discovery examinations of adversary's experts whose findings or opinions go to the establishment of a principal fact in issue and for a discussion of the trial court's exercise of discretion to assure that such examinations are consonant with the purpose of pretrial discovery and not an abuse of the statutory privilege.

foundation is likely to mislead or confuse the jury. In general, however, if the premises upon which the conclusion is reached are to be attacked as being inadequate to support the opinion, even in light of the expert qualifications, it becomes the duty and obligation of opposing counsel to draw out the data on which the expert has arrived at his opinion. This is what was done in the instant case, and it became apparent after cross-examination that a substantial foundation existed for Harold Vik's opinion.

Under the circumstances of this case, we conclude that, even under the rules existing heretofore, the plaintiff was not required to propound a hypothetical question to its expert witness; and under the rule which we adopt herein, no hypothetical questions will be routinely required and attacks upon the premises upon which expert opinions are based must ordinarily be reached by cross-examination.

*By the Court.*—Judgment affirmed.