Brad KOLPIN and Virginia Kolpin, Plaintiffs-
Respondents-Cross Appellants-Petitioners,

v.

PIONEER POWER & LIGHT COMPANY, INC.,
Defendant-Appellant-Cross Respondent.

Supreme Court

*No. 88-2076. Argued February 26, 1991.—Decided May 21,
1991.*

(Also reported in 469 N.W.2d 595.)

For the plaintiffs-respondents-cross appellants-petitioners there were briefs by *William J. Corrigan* and *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.,* Appleton and oral argument by *Joseph J. Beisenstein.*

For the defendant-appellant-cross respondent, there was a brief by *Lindsay G. Arthur, Jr.* and *Arthur, Chapman & McDonough, P.A.,* Minneapolis, Minnesota and oral argument by *Lindsay G. Arthur, Jr.*

Amicus curiae brief was filed by *Marsha M. Mansfield, James W. Gardner* and *Lawton & Cates, S.C.,* Madison for Wisconsin Academy of Trial Lawyers and The Electromagnetics Research Foundation, Inc.

Amicus curiae brief was filed by *Terrence C. Thom, Dorothy H. Dey* and *Quale, Feldbruegge, Calvelli, Thom & Croke, S.C.,* Milwaukee for Northern States Power Company, Wisconsin Electric Power Company, Wisconsin Public Service Corporation, Superior Water, Light & Power Company, Wisconsin Power and Light Company and Wisconsin Electric Cooperative Association.

DAY, J. This is a review of a decision by the court of appeals. *Kolpin v. Pioneer Power & Light Co.,* 154 Wis. 2d 487, 453 N.W.2d 214 (Ct. App. 1990). The majority of the court of appeals (Gartzke, P.J., dissenting) reversed a judgment in favor of Brad and Virginia Kolpin (Kolpins) against the Kolpins' electric company, Pioneer Power & Light (Pioneer) for damages to their

dairy herd caused by stray voltage. *Id.* at 501. A jury found in favor of the Kolpins on theories of negligence, strict liability and nuisance. The jury also found that the Kolpins knew, or with the exercise of reasonable care should have known, that Pioneer's distribution system was a cause of damage to their dairy operation over six years prior to the time the Kolpins filed their complaint. The circuit court for Marquette county, the Honorable David C. Willis, presiding, ruled on motions after verdict that Pioneer's negligence was "continuing," and therefore the Kolpins' suit was not barred by the six year statute of limitations.[1]

The majority of the court of appeals upheld the jury's verdict on "discovery" of the cause of action and determined that the Kolpins' negligence claim was time-barred. *Id.* at 490. It also held that the circuit court erred in submitting the strict liability claim to the jury, and that the Kolpins had abandoned their nuisance claim on appeal. *Id.* Judge Gartzke, in his dissent, was of the opinion "that the cause of the [Kolpins'] damages was temporary," and therefore the Kolpins should have been allowed to bring successive actions against Pioneer. *Id.* at 502–503. Judge Gartzke stated that a new trial should be ordered under sec. 752.35, Stats.,[2] and the Kolpins

---

[1]The statute of limitations (1987–88) applicable in this case provides:

> **893.52 Action for damages for injury to property.** An action, not arising on contract, to recover damages for an injury to real or personal property shall be commenced within 6 years after the cause of action accrues or be barred, except in the case where a different period is expressly prescribed.

[2]Section 752.35, Stats. 1987–88 provides:

> **752.35 Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order

should be able to attempt to recover damages for the six years preceding the date they commenced their action; but recovery for damages anytime prior to that was barred by the statute of limitations. *Id.* at 506.

The issues the Kolpins presented for review are:

(1) Are the Kolpins' claims barred by the statute of limitations?

(2) Should the jury's answer to the "discovery" question be changed as a matter of law?

(3) Are the Kolpins entitled to a new trial for the six years before they filed suit?

(4) Was the case properly submitted to the jury on the theory of strict liability? and

(5) Did the Kolpins abandon nuisance as a theory of recovery on appeal?

In addition, Pioneer, in its brief, claims that the circuit court erred in refusing to grant Pioneer a new trial, and raises the following issues:

(6) Did the circuit court err in refusing to grant judgment notwithstanding the verdict?

(7) Did the circuit court err in refusing to instruct the jury on standards for electrical companies?

(8) Did the circuit court err in refusing to give the jury a state-of-the-art instruction?

---

appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

(9) Did the circuit court err in allowing one of the Kolpins' experts to testify about stray voltage on the farm between 1977 and 1983? and

(10) Did the circuit court err in admitting exhibit fifty-six—notice of a meeting on stray voltage?

We conclude that under the "discovery rule," the Kolpins' claims are not time-barred, and that the jury's answer to the "discovery" question should be changed from "yes" to "no" as a matter of law.

Second, we conclude that the circuit court did not err in denying Pioneer's motion for judgment notwithstanding the verdict and did not abuse its discretion in refusing to grant Pioneer a new trial. Finally, we conclude that the Kolpins have succeeded on a theory of negligence and therefore it is unnecessary to address their strict liability and nuisance claims.

This action was filed by the Kolpins on February 17, 1987, against Pioneer for damages to their dairy herd caused by stray voltage. According to David Winter, the Kolpins' electrical expert, "neutral to earth" voltage produces voltage that strays from the area one would think it would be. It is a natural phenomenon and is present on all active distribution systems. It can come from a variety of different sources, both on and off the farm.[3] When this voltage strays in unreasonably high amounts, and flows along paths which conduct electricity, such as metal and water, it becomes dangerous.

---

[3] The distribution of voltage from the power company comes out to the farm via a three-phase hot wire overhead structure and down through transformers to the barn. The current comes back to the utility on a primary neutral wire, to the substation. The primary system is connected to a secondary neutral wire, which runs to the barn in a service entrance box, or main switch box. Current that comes back to the utility produces voltage on the primary neutral. This voltage may travel along metal in the barn.

10

Mr. Winter testified:

> We are talking about the voltage that strays from those grounding rods to ours where we didn't expect it. That's where our term came from, and the voltage that accesses a cow, then, is considered to be stray when it accesses her when she is drinking water . . ..
> We need to know what is the voltage going to be in the water cup, the milk parlor, or at the water stands. We need to know how much voltage is going to get through and traumatize the cow.

(Transcript of Proceedings, June 16, 1988, pp. 24, 26.)

> [S]tray voltage is a voltage of very low level voltage that accesses the cow. In order to access that cow it changes her behavior. It makes her nervous, it make her not want to eat or drink properly, it creates—can cause a lot of stress on the cow which causes production drops, causes increased mastitis [inflammation of the udder] possible bleeding problems, causes a lot of frustration to the dairymen because he's working very hard to make his herd go in the positive direction and it's not happening.

(Transcript of Proceedings, June 14, 1988, pp. 19–20.)

The Kolpins began to notice this type of behavior among their cows in March, 1977. The cows refused to enter the milking parlor; they were kicking the milkers; they were weaving, stopping, bellowing and urinating during milking; they were lapping at the waterers; and they were not eating. The Kolpins noticed that it took longer to milk their cows, and the cows would not let down their milk. They also noticed a dramatic increase in the incidence of mastitis. At this same time, electrical consumption on the farm had increased when they installed a new milking parlor.

11

The Kolpins, trying to remedy the problem with their cows, called their veterinarian. The veterinarian suggested they contact some experts. An equipment expert and state veterinarian thought the problem might be with equipment, but they could not find any equipment problems.

In the fall of 1979 or spring of 1980, Mr. Kolpin read an article about stray voltage in a farm magazine. The herd in the article had symptoms similar to the Kolpins' herd. The article related the symptoms to electrical problems.

Mr. Kolpin decided to purchase a voltmeter and test for voltage. After discovering voltage readings of 12–15 volts in the milking parlor, he called his electrician, Pete Matteoni, to investigate the problem and look for stray voltage. In 1980, Mr. Matteoni did his own test for voltage in the barn. He found voltage readings, but did not know what they meant. Mr. Matteoni suggested that Mr. Kolpin contact his utility company.

Mr. Kolpin contacted Pioneer, and the company sent Dennis Dahlke to the farm to take some measurements. Mr. Dahlke testified that at that time, he did not know where or how to measure for stray voltage or what any voltage readings might mean. Mr. Dahlke told Mr. Kolpin that he would call someone to find out more about the voltage readings.

A few days later, Stuart Rasmussen, of the Public Service Commission, took some voltage readings on the farm, but he did not tell Mr. Kolpin whether or not he had stray voltage. Mr. Kolpin testified:

> Q. Now, did—After Mr. Rasmussen was there the first time, did he tell you one way or another whether you had any problems with stray voltage?

A. No. Mr. Rasmussen is a—well, he's a little different. He's kind of—Sometimes he comes on to you and he tells you a lot of stuff and the next time he'll clam up and won't say anything. At that particular time he was a little disturbed, maybe by these figures or these voltage levels, and he did mention some things, but they didn't make any sense to me at that particular time.

Q. Just focusing on that particular time. Did you have any idea what the levels you were measuring meant?

A. No, I didn't.

Q. Did you know whether or not that the cows were being affected by any voltage that might be in the parlor?

A. No.

(Transcript of Proceedings, June 14, 1988, pp. 26–27.)

Mr. Rasmussen continued to visit the Kolpin farm until 1985. He suggested changing electrical motors and circuitry on the farm, which the Kolpins did. But the Kolpins did not notice any change in their cows or milk production.

In the spring of 1980, Pioneer made some changes in its distribution system by driving in twenty additional grounding rods on the distribution line that served the farm. After the rods were in, the voltage level in the barn dropped from fifteen volts to two volts. But Mr. Kolpin still did not notice any changes in his cows or in his milk production. He testified that Mr. Rasmussen told him maybe the problem was "on farm" or maybe the problem was "off farm." The Kolpins continued to discuss their problem with Pioneer linemen on an informal basis.

In September, 1983, Mr. Kolpin hired an electrical contractor, Bill McTier. Mr. McTier had some back-

13

ground on stray voltage and suggested that if the Kolpins had an "on farm" problem, they should bond everything in the ground. The Kolpins installed an electronic grounding device in November 1983, manufactured by the ITT Blackburn Company, which was supposed to solve stray voltage problems. Following the installation of the grounding system, milk production quickly "bottomed out," but then increased to the level of the herd's past performance. The herd's behavior returned to normal too. Mr. Kolpin testified that "we weren't sure it was stray voltage or what it was," until 1983, when the grounding system was installed and the voltage levels dropped to their lowest level.

On January 16, 1986, the Kolpins wrote a letter to the manufacturer of the grounding device stating, "we are very pleased with the results of our electronic grounding system in reducing the stray voltage caused by our power company's inability to effectively ground their primary neutral system."

The Kolpins filed suit against Pioneer on February 17, 1987, on theories of negligence, strict liability and nuisance. They claimed that they were damaged, mainly in the form of lost milk production, during the time their cows were exhibiting strange behavior from the stray voltage. Pioneer answered, denying liability and raising the statute of limitations as an affirmative defense. On May 10, 1988, Pioneer moved for summary judgment on the basis that the Kolpins discovered their causes of action more than six years before commencing suit. Pioneer asserted that under Wisconsin's "discovery rule," the Kolpins' claims were untimely. The Kolpins countered that the "discovery rule" was inapplicable, and that the court should apply a "continuum of negligence" doctrine to toll the statute of limitations. The circuit court denied Pioneer's motion for summary judgment,

ruling that "the continuum theory of negligence and damages applies. Based on that, the last date of damages was November of 1983 and the instant action was started well within the six years after November of 1983."

The case was tried before a jury in June, 1988. By special verdict, the jury found Pioneer causally liable on all three theories, and found the Kolpins thirty percent negligent. The jury also answered "yes" to question number twelve of the verdict, which asked "Did Brad or Virginia Kolpin know, or should they with the exercise of reasonable care have known, prior to February 17, 1981, that Pioneer's electrical distribution system was a cause of damage to their dairy operation?" With regard to question thirteen, the jury found that Pioneer's electrical distribution system did not cease being a cause of damage to the Kolpins' dairy operation prior to February 17, 1981.

On motions after verdict, Pioneer requested judgment in its favor, dismissing the Kolpins claims based on the jury's answer to special verdict question number twelve. Pioneer also requested, among other things, judgment notwithstanding the verdict, on the grounds that there was insufficient evidence to support the jury's answer regarding causation on the theories of negligence, strict liability and nuisance. Additionally, Pioneer requested a new trial, alleging several errors of law. The Kolpins requested that the court change the jury's answer to question number twelve of the verdict because there was no credible evidence to support it.

By order, dated September 9, 1988, the circuit court stated:

> The negligence of the Defendants was continuing negligence of failure to act. They had as such reason and cause to know that their distribution system was

causing damage to the Plaintiff, and each day that they failed to take proper steps to correct that negligence was a new damaging act, a continuum of negligence. That negligence of lack of action continued right up to November of 1983 when the Plaintiffs, at their own expense, installed a system to divert the stray voltage coming from the Defendant's lines.

The Court continues to rule that the continuum of negligence theory or rule applies, that the Plaintiffs started their case within 6 years of the last act and are entitled to their recovery and damages.

On October 5, 1988, judgment was entered against Pioneer in the amount of $133,326.90 plus costs and interest.

Pioneer appealed, and the Kolpins cross-appealed. The majority of the court of appeals held that "the continuous negligence rule is limited to cases involving negligent medical treatment." *Kolpin,* 154 Wis. 2d at 493. The evidence at trial "provide[d] adequate support for the jury's finding that the Kolpins knew or in the exercise of reasonable care should have known prior to February, 1981, that stray voltage was a cause of harm to their dairy operation. As a result, their negligence cause of action is barred by sec. 893.52, Stats." *Id.* at 496–497. The court of appeals also concluded that Pioneer did not argue the statute of limitations defense against the Kolpins' claims of strict liability and nuisance. The court of appeals recognized that electricity can be a product within the meaning of the Restatement (Second) of Torts, sec. 402A (1965).[4] *Ransome v. Wisconsin Electric Power Co.,* 87 Wis. 2d 605, 620, 275 N.W.2d 641,

[4]Section 402A requires that the following elements be proved in order for strict liability to attach:

(1) that the product was in defective condition when it left the possession or control of the seller,

648 (1979). But the court held that the Kolpins' problem had nothing to do with electricity. Their problem was stray voltage, a natural by-product of electricity, which is not a product sold to the consumer. *Kolpin,* 154 Wis. 2d at 498.

Finally, the court of appeals concluded that since the Kolpins did not refute Pioneer's arguments on nuisance, but instead, asserted that their cows were damaged from stray voltage caused by Pioneer's distribution system, the Kolpins, in effect, abandoned their nuisance claim. *Id.* at 500–501.

Judge Gartzke, in his dissent, stated that Pioneer's negligence was not disputed on appeal; that the Kolpins knew or should have known by February 17, 1981, that the company's electrical system was a cause of their damages; and that Pioneer's electrical distribution system continued to cause damages to the Kolpins after February 17, 1981, until early 1985. *Id.* at 501–502 (Gartzke, P.J., dissenting). Judge Gartzke determined that the Kolpins could not recover for their damages which accrued before February 17, 1981. *Id.* at 502. But since the cause of their damages was temporary, pursuant to *Peterson v. Wisconsin River Power Co.,* 264 Wis. 84, 58 N.W.2d 287 (1953), the Kolpins could attempt recovery for damages they sustained after February 17, 1981. *Id.* at 504. Otherwise, Pioneer would have "a

---

**(2)** that it was unreasonably dangerous to the user or consumer,

**(3)** that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages,

**(4)** that the seller engaged in the business of selling such product . . . and

**(5)** that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was in when he [or she] sold it. *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d at 55 (1967).

license to inflict more harm merely because a statute of limitations has barred recovery for damages which occurred more than six years before the present action was brought." *Id.* at 505.

■ The first issue concerns the application of the statute of limitations and its effect on the Kolpins' claims. The construction of a statute of limitations is a question of law which we review without deference to the circuit court's decision.

The Kolpins argue first, that their claims have a single cause of action to which the continuing negligence theory applies. Second, they argue that if the "discovery rule" applies, they are entitled to a new trial to recover damages to their cows after February 17, 1981, pursuant to Judge Gartzke's dissent. Pioneer asserts that the Kolpins' claims are time-barred under the "discovery rule," and that even if the continuing negligence doctrine applies, the Kolpins failed to bring suit within six years of the "last act of negligence."

The "discovery rule" was set forth by this court in *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 335 N.W.2d 578 (1983). In *Hansen,* the plaintiff sustained injuries in late May, 1978 from an intrauterine device (IUD) manufactured and sold by A.H. Robins. *Id.* at 552. Two separate medical examinations did not reveal that the plaintiff's symptoms were traceable to the IUD. *Id.* at 552–553. Finally, on June 26, 1978, the plaintiff's doctor removed the IUD and concluded that she probably had pelvic inflammatory disease. (PID). *Id.* at 553. The plaintiff recovered from the PID, but the disease had left her fallopian tubes blocked, rendering her sterile. *Id.* at 553. On June 24, 1981, the plaintiff commenced a diversity action in the United States District Court

against A.H. Robins to recover damages arising out of her use of the IUD. *Id.*

On a motion for summary judgment, based on the three year statute of limitations, the trial court ruled that the plaintiff "was injured 'sometime prior to June 13, 1978' and, therefore, her claim accrued before that date." *Id.* The court held that the plaintiff's claim was barred by the statute of limitations. *Id.*

In *Hansen,* the statute of limitations issue was certified to this court, by the Court of Appeals of the Seventh Circuit. This court noted that "using the date of injury as the benchmark for accrual of claims can yield extremely harsh results." *Id.* at 556. But under the "discovery rule," "a claim accrues when the injury is discovered or reasonably *should* have been discovered." *Id.* at 559. In *Hansen,* this court held that:

> In the interest of justice and fundamental fairness, we adopt the discovery rule for all tort actions other than those already governed by a legislatively created discovery rule. Such tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first. All cases holding that tort claims accrue at the time of the negligent act or injury are hereby overruled.

*Id.* at 560.

The court concluded that the plaintiff's claim accrued on June 26, 1978, and that her complaint was timely filed. *Id.* at 561.

The "discovery rule" was further clarified in *Borello v. U.S. Oil Co.,* 130 Wis. 2d 397, 388 N.W.2d 140 (1986). In that case, Mary Borello had the U.S. Oil Company install a furnace, manufactured by the Williamson Company, in her home in December of 1977. *Id.* at 400. Within a few weeks, she complained of a bad odor from

19

the furnace. *Id.* On December 29, 1977, Mary Borello wrote a letter to U.S. Oil, stating that her previous furnace problems, which she had before the installation of the Williamson furnace, had been aggravated. *Id.* She described her problems as: "[m]y nose burns, makes me dizzy, headaches are bad and now my chest even hurts. It seems there is a lack of oxygen and I keep opening the windows." *Id.* She also stated that she had masonry experts check her chimney for problems, but no defects were found. *Id.*

At this time, Mary Borello had formed a subjective belief that the furnace was the cause of her problems. *Id.* at 401. But she was told by various physicians that "her complaints could not, with any degree of probability, be attributed to the furnace." *Id.* Finally, after returning home from the hospital after suffering from what her physicians thought was "systemic viral infection," she found a red dust covering the flat surfaces of her home. *Id.* at 402. "[I]t was not until this event, on February 20, 1979, that she knew the furnace to be the cause of her illness." *Id.* In October of 1979, her knowledge was confirmed by her physician. *Id.* at 402–407. He found that her symptoms were a result of "metal fume fever," related to the 1977 installation of her furnace. *Id.* at 403. On November 25, 1981, Mary Borello filed suit. *Id.*

The defendants asserted that Mary Borello discovered that the furnace was a cause of her injuries more than three years before commencement of the action. *Id.* at 401. This court, however, in an application of the "discovery rule," ruled that "a legislatively approved pattern of the discovery rule dictates that a cause of action does not accrue until the nature of the injury *and* the cause—or at least a relationship between the event and injury—is or ought to have been known to the claimant." *Id.* at 406–407. Mary Borello had no information with

respect to the nature of her illness until her diagnosis of metal fume fever. *Id.* at 406. Until that diagnosis, all she had was a "hunch" that her injury was related to the defective furnace. *Id.* The court concluded that "the statute of limitations did not commence to run against Borello's claim until she had a basis for objectively concluding that metal fume fever from a furnace installed by the U.S. Oil Company and manufactured by the Williamson Company was probably the cause of her symptoms." *Id.* at 414–415.

The court determined that "Borello's cause of action, which accrued on October 30, 1979, [the date she was diagnosed with metal fume fever] was not barred by the statute of limitations." *Id.* at 424.

The other theory submitted in this case, the "continuing negligence" doctrine, as the Kolpins and Pioneer call it, is actually the principle whereby a claimant brings one cause of action for a defendant's continuum of negligent acts. This doctrine was applied in *Tamminen v. Aetna Casualty & Surety Co.,* 109 Wis. 2d 536, 327 N.W.2d 55 (1982), a medical malpractice case. In *Tamminen,* the claimant alleged that she had been injured by the defendant's purported acts of negligence, occurring between November 3, 1975 and March 30, 1976, when she was a patient of Dr. William A. Kisken, the Gundersen Clinic, and the La Crosse Lutheran Hospital. *Id.* at 540 n.3. On October 30, 1978, Tamminen filed a "submission of controversy." *Id.* at 540. On January 11, 1980, she filed suit against the defendants in circuit court. *Id.*

Tamminen filed an amended complaint on May 21, 1980. The circuit court granted the defendants' motion for summary judgment, based on the theory that the three year period of limitations barred any cause of action for any act of negligence occurring prior to Janu-

21

ary 12, 1976. *Id.* at 548. Tamminen appealed, and the court of appeals affirmed the circuit court decision. *Id.* On review, this court held that:

> [w]here there is a continuum of negligent medical care related to a single condition occasioned by negligence, there is but one cause of action; and if any act of negligence within that continuum falls within the period during which suit may be brought, the plaintiff is not obliged to split his cause of action but may bring suit for the consequences of the entire course of conduct.

*Id.* at 556.

For Tamminen, "there was but a single unit of negligent treatment, both surgical and remedial" from the time she entered the clinic until March 30, 1976, when she was discharged from the hospital. *Id.* at 558. The court stated:

> A cause of action accrues only when the cause of action is complete; and where, as here, it is averred in the affidavits that the negligent acts of malpractice were continuous, the cause of action is not complete until the last date on which the malpractice occurred. If an action is timely brought in relationship to that last date, the entire cause of action is within the jurisdiction of the court. Accordingly, plaintiff's commencement of the action was timely.

*Id.* at 559.

The rule in *Tamminen* was applied in *Robinson v. Mt. Sinai Medical Center,* 137 Wis. 2d 1, 402 N.W.2d 711 (1987). In that case, the plaintiff, Humberto Robinson, had gone to the emergency room on January 20, 1979, suffering from a toothache, a frontal headache, and chills and a fever. *Id.* at 5–6. He had also been vomiting for five days and his right eye and cheek were swollen.

*Id.* at 6. After a resident misdiagnosed his problem, Robinson's condition worsened. *Id.* After returning to the hospital and being admitted, he underwent an allegedly negligent course of treatment which included four major neurosurgical procedures. *Id.* at 6. Robinson eventually became thoroughly demented and was rendered a total invalid. *Id.* He was discharged from the hospital on September 13, 1979. *Id.* at 7.

On April 7, 1982, Robinson filed a "submission of controversy" with the Patient's Compensation Panel. *Id.* at 7–8. On March 2, 1984, Robinson and his mother commenced an action against the hospital, its insurer, and the Patients Compensation Fund. *Id.* at 8. The defendants moved for summary judgment on the basis of the three year statute of limitations. *Id.* at 9. Relying on *Tamminen,* the circuit court denied the motion. *Id.* The court of appeals affirmed. *Id.*

On review, this court affirmed, concluding that "the record sets forth a case in which the *Tamminen* rule should apply. The facts as averred by Plaintiffs evince a situation 'where there is a continuum of negligent medical care related to a single condition occasioned by negligence.' " *Id.* at 20 (citing *Tamminen,* 109 Wis. 2d at 556).

In the case before the court, the Kolpins and the trial court are of the opinion that the "discovery rule" of *Hansen* and *Borello* and the "continuum of negligent acts" doctrine of *Tamminen* and *Robinson* are two discrete theories. Accrual of a cause of action will depend on which theory the court accepts. Pioneer, in an attempt to reconcile the two theories, asserts that the rule in *Tamminen* and *Robinson* only applies to negligent medical treatment cases. In all other situations, Pioneer argues, the "discovery rule" of *Hansen* and *Borello* applies.

■

This court, in setting forth the "discovery rule" and the "continuum of negligent acts" doctrine did not create two discrete theories of accrual of a cause of action. Under *Tamminen* and *Robinson,* if a defendant engages in a continuum of separate negligent acts which cause the plaintiff damage, the cause of action is not complete until the last act of negligence occurs. Once the cause of action is complete, then the cause of action accrues.

■

Under *Hansen* and *Borello,* if a defendant engages in a negligent act (or a continuum of negligent acts such as in *Tamminen* or *Robinson*) which causes the plaintiff damage, the cause of action is not complete until the plaintiff knows, objectively, the cause of the injury and the defendant's part in that cause. Once the cause of action is complete, then the cause of action accrues.

■

The two lines of cases stand for the proposition that in order for a cause of action to accrue, it must be complete. It is complete when the negligent act occurs, or the last act occurs in a continuum of negligent acts, *and* when the plaintiff has a basis for objectively concluding that the defendant was the cause of the plaintiff's injuries and damages. In *Tamminen* and *Robinson,* the plaintiffs already knew the cause of their injuries and the defendants' part in the cause. Once the last act of negligence in the continuum occurred, the action was complete. In *Hansen* and *Borello,* once the act of negligence occurred, the cause of action was not complete. The plaintiffs did not objectively know the cause of their injuries or the defendants' part in that cause.

In the case before the court, one act of negligence is alleged. That is, that "the defendant was negligent in the equipment used and the distribution system used in pro-

24

viding electrical services to the plaintiffs' farm during the time periods material to this claim." Unlike *Tamminen* and *Robinson,* the plaintiff's injuries were not the result of a series of negligent acts in a continuum. Although the injuries to the plaintiff's cows continued over a period of time, the alleged act of negligence was the use of a distribution system which allowed stray voltage to reach the Kolpin's cows. No series of separate negligent acts is alleged. Similarly, in *Borello,* although Mary Borello continued to suffer from "metal fume fever" after the furnace was installed, the alleged negligence amounted to one act—the installation of a faulty furnace.

Even though the Kolpins' cause of action was "complete" according to *Tamminen* and *Robinson,* it may not have been "complete" under the "discovery rule" of *Hansen* and *Borello.* The jury found that the Kolpins knew, or with the exercise of reasonable care should have known, that Pioneer's distribution system was the cause of their damages before February 17, 1981. The Kolpins argue that the jury's answer to the discovery question should be changed as a matter of law. We agree.

A jury's verdict should be overturned if there is no credible evidence to support it. *Yelk v. Seefeldt,* 35 Wis. 2d 271, 277, 151 N.W.2d 4 (1967). When the circuit court does not make an analysis of the evidence sustaining the verdict, the appeals court must review the record as a matter of first impression to see if there is any credible evidence to support the verdict. *Kuhlman, Inc. v. G. Heileman Brewing Co., Inc.,* 83 Wis. 2d 749, 765, 266 N.W.2d 382 (1978). Under *Borello,* for the Kolpins' cause of action to accrue by February 17, 1981, they

must have objectively known, at that time, the cause of their injuries and Pioneer's part in that cause.

By 1980, Mr. Kolpin was aware of the concept of stray voltage and wanted to find out whether it was the cause of the problems with his cows. After discovering voltage readings on his farm, he had a "hunch" that stray voltage was his problem. But he did not know or even have a "hunch" that the problem was attributable to Pioneer. He could not tell whether it was something he was doing in his operation or whether the stray voltage was due to the power company. Mr. Kolpin called his electrician, Mr. Matteoni, to test for stray voltage, but Mr. Matteoni did not know what the voltage readings meant. Neither Mr. Dahlke, from Pioneer, nor Mr. Rasmussen, from the Public Service Commission, knew whether it was stray voltage that was reaching the Kolpins' farm.

In the spring of 1980, when Pioneer drove in additional grounding rods along its distribution line, the voltage level dropped. But the Kolpins still did not notice any changes in their milk production. Finally, in November of 1983, when the Kolpins installed an electronic grounding device which was designed to solve stray voltage problems, their milk production improved. Mr. Kolpin testified that only then did he actually believe he had a stray voltage problem. Once the problem was remedied, the Kolpins objectively knew that Pioneer's distribution system, and not their own farm operation, was the cause of their problem.

This case does not involve the typical tort claim, *e.g.,* an automobile accident case, where the cause and effect of a plaintiff's injuries are readily apparent. *See Borello,* 130 Wis. 2d at 412. Because of the difficulties in pinpointing the exact source of stray voltage, it is difficult for a plaintiff to determine the relationship between

the stray voltage and its source. The source could be the plaintiff's own electrical wiring, a defect in the milking parlor, or an improperly grounded line leading to the barn. But in this case, once the Kolpins found the solution to their problem, they were able to trace it to the cause of their problem—Pioneer's distribution system. The "discovery" was more of a process of elimination of possible causes rather than a process of determination of the cause.

We conclude that under the "discovery rule," the Kolpins did not discover, or with the exercise of reasonable care should not have discovered, prior to February 17, 1981, that Pioneer's electrical distribution system was a cause of damage to their dairy operation. Under the objective standard of *Borello*, the jury's answer to special verdict question number twelve could have only been "no." We hold that the Kolpins' case against Pioneer did not accrue until November, 1983, when they installed the electronic grounding device. Therefore, the Kolpins' action against Pioneer was commenced within the six year statute of limitation period of sec. 893.52, Stats.

Even though the Kolpins' claims are not barred by the statute of limitations, Pioneer contends that the circuit court erred in refusing to grant judgment notwithstanding the verdict on the basis of insufficient competent evidence to support the jury's findings of causation on strict liability, nuisance and negligence. Pioneer also argues that the circuit court abused its discretion in refusing Pioneer's motion for a new trial which was based on several alleged trial errors.

In response to Pioneer's motions after verdict, the circuit court stated that "if there was one centillion [sic] of evidence to support the finding of the jury, the jury's

verdict must be sustained." (Transcript of Proceeding, July 14, 1988, p. 41.) *See also Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305, 347 N.W.2d 595 (1984) (the jury's verdict must be sustained if there is any credible evidence to support it). The circuit court found "that as a matter of fact in the application of the facts, there was evidence in the record, which if the jury chose to believe and they did believe from what they based their verdict, to support their verdict in each instance." (Transcript of Proceedings, July 14, 1988, pp. 41–42.)

█

Judgment notwithstanding the verdict is a motion after verdict brought under sec. 805.14(5)(b) Stats.[5] Its purpose was stated by this court in *Herro v. Dept. of Natural Resources,* 67 Wis. 2d 407, 413–414, 277 N.W.2d 456 (1975).

> A motion for judgment notwithstanding the verdict admits for the purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted the moving party on grounds other than those decided by the jury. *Hennington v. Valuch* (1965), 27 Wis. 2d 130, 133 N.W.2d 824; *Shumway v. Milwaukee Athletic Club* (1945), 247 Wis. 393, 20 N.W.2d 123; *Volland v. McGee* (1941), 236 Wis. 358, 294 N.W. 497, 295 N.W. 635. The motion does not raise the issue as to whether there is sufficient evidence to support the verdict and the application may not be granted on the ground that

---

[5]Section 805.14(5)(b), Stats. 1987–88 provides:

**805.14 Motions challenging sufficiency of evidence; motions after verdict . . . .. (5)** MOTIONS AFTER VERDICT . . . .. (b) *Motion for judgment notwithstanding verdict.* A party against whom a verdict has been rendered may move the court for judgment notwithstanding the verdict in the event that the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment.

the verdict is against the great weight of the evidence. *State v. Escobedo* (1969), 44 Wis. 2d 85, 90, 91, 170 N.W.2d 709. While not challenging the sufficiency of the evidence to support the facts found in the verdict, it may be used to challenge whether the facts found in the verdict are sufficient to permit recovery. *Wozniak v. Local 1111 of UE* (1973), 57 Wis. 2d 725, 205 N.W.2d 369; *State v. Escobedo, supra,* page 90. The purpose of the motion is to avoid a new trial and to secure a final judgment in favor of the movant. *State v. Escobedo, supra,* page 91. It is generally held that judgment notwithstanding the verdict is not the proper remedy where there are defects in the evidence which can be remedied by a new trial. Thus it is said that neither the admissibility of evidence nor its sufficiency may be challenged by the motion. 46 Am. Jur. 2d, *Judgments,* p. 391, sec. 117; 49 C.J.S., *Judgments,* p. 165, sec. 60.

In its motion for judgment notwithstanding the verdict, Pioneer challenged the sufficiency of the jury's finding on causation. In Pioneer's brief in support of its motion, it attacks the testimony of the Kolpins' expert, Mr. David Winter, as incompetent, without foundation, and erroneously received in evidence. Even if Mr. Winter's testimony was properly admissible, Pioneer argues, it cannot, standing alone, provide the basis for a jury finding that stray voltage existed on the Kolpin farm during the period of 1977 through 1983.

We conclude that the circuit court properly denied Pioneer's motion for judgment notwithstanding the verdict. First, since Pioneer was challenging the sufficiency of the evidence to support the jury's verdict, judgment notwithstanding the verdict would be improper. *See Herro,* 67 Wis. 2d at 413. Second, even if Pioneer admits that the facts in the jury verdict are true (which it does

not) it gives the court no other reason why judgment should be granted in its favor on the basis of causation.

We conclude that there was at least one scintilla of evidence to support the jury's verdict on causation, and, in fact, much more. Even without Mr. Winter's testimony, the jury sat for eight days of trial and reviewed evidence consisting of charts and data on milk production and voltage readings on the Kolpin farm. It also heard testimony about stray voltage on the farm by Mr. Rasmussen, Mr. Dahlke, Mr. Kolpin, and Truman Surbrook, among others, which is more than enough to support the jury's verdict on causation. Even though the circuit court reached the right result for a different, or arguably erroneous reason, we find enough evidence to support the jury's verdict and sustain the circuit court's ruling. *See State v. Alles,* 106 Wis. 2d 368, 391, 316 N.W.2d 378 (1982).

As for Pioneer's motion for a new trial, "the trial court's ruling on a motion for a new trial is highly discretionary and will not be reversed on appeal in the absence of a showing of abuse of discretion." *Priske v. General Motors Corp.,* 89 Wis. 2d 642, 663, 279 N.W.2d 227 (1979). In its partial verbal ruling on Pioneer's motions after verdict, the circuit court focused on evidence which supported the jury's verdict. It did not consider Pioneer's alleged errors of law, or whether a new trial should be granted on such errors. Despite this, we will uphold the discretionary decision of the circuit court if we can conclude *ab initio* that there are facts of record which could support the circuit court's decision, had discretion been exercised on the basis of those facts. *See generally, Id.*

Pioneer first alleges that the circuit court erred in refusing to give the jury instructions on standards for

electric companies.[6] Pioneer also alleges that the circuit court erred in refusing to give the jury instructions on

---

[6]During the jury verdict conference, Pioneer requested that the trial court read the following instruction to the jury: "In determining whether or not Defendant, Pioneer Power and Light Company, was negligent or created or maintained a nuisance or provided electricity that was in a defective condition unreasonably dangerous to the user you may consider the existence of two Wisconsin statutes. The two Public Service Code regulations were: s. PSC 113.015 Wis. Adm. Code (Dec. 1987) and s. PSC 114.96A3 Wis. Adm. Code (March, 1988).

Set out herein, is the text of the regulations:

Miscellaneous Service Requirements. PSC 113.015 General requirement. Every utility shall furnish reasonably adequate service and facilities at the rates filed with the commission and subject to these rules and the rules of the utility applicable thereto and not otherwise. The energy shall be generated, transmitted, converted, and distributed by the utility, and utilized, whether by the utility or the customer, in such manner as to obviate so far as reasonably practicable undesirable effects upon the operation of standard services or equipment of the utility, its customers, or other utilities or agencies.

SECTION 9. GROUNDING METHODS FOR ELECTRIC SUPPLY AND COMMUNICATION FACILITIES. PSC 114.96A3 [NESC 96A3, p. 80] Multiple Grounded Systems. Change/Change A3 to read:

The neutral, which shall be of sufficient size and ampacity for the duty involved, shall be connected to a made or existing electrode at each transformer location and at a sufficient number of additional points with made or existing electrodes to total not less than nine grounds in each mile (1.6 km) of line, including those grounds at transformer locations but not including grounds at individual services.

Exception: In underground multiple-grounded systems where an insulating jacket is used over direct-buried concentric neutral supply cable, this requirement shall be permitted to be reduced to four grounds in each mile. This exception for use of supply cable with an insulating jacket shall not be permitted for random lay construction. *See* Part 3, Rule 354, "Random Separation—Additional Requirements."

---

31

the "state-of-the-art," and requests a new trial on this basis as well.

"A trial court has wide discretion as to instructions (citation omitted). If the instructions of the court adequately cover the law applicable to the facts, this court will not find error in the refusal of special instructions even though the refused instructions themselves would not be erroneous." *State v. Lenarchick,* 74 Wis. 2d 425, 455, 247 N.W.2d 80 (1976). Moreover, "even though instructions were rejected which arguably were appropriate, this court will not reverse unless the failure to include the requested instructions would be likely to prejudice the defendant." *Id.* at 455.

A material question before the jury was the standard of care in furnishing electricity to customers. The circuit court gave the jury a Wisconsin civil jury instruction on negligence.[7] Even though Pioneer's requested standard for electric companies deals with standard of care, the jury was adequately instructed on a general negligence standard. The circuit court did not err, considering the submission of the equivalent instruction on standard of

---

[7]Wisconsin JI—Civil 1019 Negligence, Evidence of Custom and Usage (1989) was given to the jury. It provides:

**1019 NEGLIGENCE: EVIDENCE OF CUSTOM AND USAGE.** Evidence has been received as to the (practice in the community) (custom in the trade or work operation) (practice in the industry) with respect to (*e.g.,* the use of 2 × 4's for rafters) (installations of ⅝" plywood for subflooring) (standing on running board to guide truck backing into shale pit). You should consider this evidence in determining whether (the defendant) acted with ordinary care. This evidence of practice is not conclusive as to what meets the required standard for ordinary care or reasonable safety. What is generally done by persons engaged in a similar activity has some bearing on what an ordinarily prudent person would do under the same or like circumstances. Custom, however, cannot overcome the requirement of reasonable safety and ordinary care.

care. *See generally, Sambs v. City of Brookfield,* 66 Wis. 2d 296, 304, 224 N.W.2d 582 (1975). Moreover, Pioneer was merely attempting to show that it went "above and beyond the call of duty" in driving in three to four times the required amount of grounding rods along its distribution line. But as counsel for the Kolpins argued at trial, this case is not a regulatory case, but a civil negligence, strict liability and nuisance case. In addition, Pioneer was free to, and did question witnesses on standards for electric companies, even though it never attempted to offer these standards into evidence.[8] Clearly, Pioneer showed no prejudice in the circuit court's refusal to give the jury instructions on the electric company standards.

As for the state-of-the-art instruction, Pioneer requested its inclusion "because of the relative infancy of the understanding of this subject." Pioneer cites *D.L. v. Huebner,* 110 Wis. 2d 581, 616–617, 329 N.W.2d 890 (1983), where evidence of the state-of-the-art of a product was admitted in a case based on alternative theories of strict liability and negligence. This same rule, Pioneer argues, applies in nuisance cases. What Pioneer requests though, is not the *admission* of state-of-the-art *evidence,* but an instruction on the state-of-the-art of electricity.

We do not find that the circuit court's refusal to give the jury a state-of-the-art instruction was in error. First, Pioneer had the opportunity to admit evidence of the state-of-the-art. Second, as was previously discussed, the jury was adequately instructed on the material issues of the case. We note that Pioneer admits in its brief to this court that "[a]lternatives to avoid the dangers of stray

[8]Pioneer cites "a body of authority from several other jurisdictions" in support of its proposition. But these cases deal with *admissibility* of electric standards into evidence, rather than the submission of jury instructions on electric standards.

voltage were not custom in the industry, nor readily available to the technological environment of public utilities, because stray voltage was, and is, poorly misunderstood." In this statement, Pioneer claims it did not understand stray voltage or know how to prevent its dangers; yet at the same time, Pioneer claims that Mr. Kolpin, being "a very experienced farmer" who has "received numerous farming awards," "knew or should have known the nature and source of the stray voltage." Just because stray voltage was a relatively new concept to utility companies does not absolve Pioneer from a duty to avoid the dangers of stray voltage to its customers. But in fact, this is the course it took. After Pioneer drove in the grounding rods, it did nothing, despite the fact that the Kolpins' milk production was still low. Mr. Kolpin was left to solve the problem on his own, which he did. The fact that Mr. Kolpin, "a very experienced farmer," could solve the stray voltage problem certainly detracts from Pioneer's statement that it did not know, nor should it have known, how to prevent the dangers of stray voltage.

Pioneer also claims it should be granted a new trial because the circuit court erred in allowing Mr. Winter to testify that stray voltage was affecting the Kolpin farm between 1977 and 1983. Pioneer objected to Mr. Winter's testimony on the basis of hearsay and lack of foundation. It claims that Mr. Winter's testimony was based on a visit to the Kolpin farm in 1987 and testimony by Mr. Rasmussen. Pioneer also asserts that Mr. Winter "did not have first-hand knowledge of the extent of stray voltage nor the source of it because he made no attempt to measure it or make such a determination." (Pioneer's brief, p. 44.) Pioneer therefore claims error because Mr. Winter's opinion, which was not based on first-hand

knowledge, was not given in response to a hypothetical question.

Mr. Winter testified, among other things, that he first visited the Kolpin farm in October or November of 1983. He was there at the request of Mr. Kolpin to see what his electronic grounding system would do to the Kolpins' herd. First, he checked to make sure the wiring was in good condition. Then he measured voltage at various points on the farm to see if there was voltage access to the cows. Exhibit twenty-five, which was received into evidence, reflects the voltage readings. Then Mr. Winter testified, to a reasonable degree of engineering certainty, that there was stray voltage on the Kolpin farm, affecting the cows, from the time the Kolpins installed the milking parlor until the time they installed the electronic grounding device. Mr. Winter also testified that he had formed an opinion as to the source of the stray voltage reaching the Kolpins' cows.

After an objection from Pioneer's counsel, the Kolpins' counsel went through a lengthy series of questioning with Mr. Winter to lay the foundation for his opinion. Mr. Winter discussed the various voltage readings he took in 1983 and analyzed, among other things, cow contact with voltage on multiple areas of the farm and the effect of turning on all electrical equipment in sequence. Finally, he came to the conclusion, to a reasonable degree of engineering certainty, that the current was "coming off of the utility."

As for his opinion of stray voltage on the farm in 1977, Mr. Winter testified that he relied on Exhibit seventy-nine—data compiled by Truman Surbrook, another expert witness in this case. Mr. Winter testified that, considering all of the information he had gathered, and disregarding Pioneer's changes to its system (the grounding rods), there was no essential change in voltage

levels on the Kolpin farm between 1977 and the time of the installation of the electronic grounding system. He testified that the primary source of the voltage was the utility. He also gave the opinion that the utility company, receiving the information about stray voltage and the Kolpins' complaints, would have a "duty to make sure nothing was affecting his customers who had an investment in the dairy herd." (Transcript of Proceedings, June 16, 1988, pp. 52–85.)

On cross-examination, Pioneer's counsel questioned Mr. Winter on the bases of his opinion:

Q There is one other thing that puzzles me here. You were out at the farm in 1983, and you were out at the farm in 1987 but you are telling the jury about what the farm looked like in 1977, and I guess I just don't understand how you can do that?

A I can reconstruct based on other testimony that's in evidence in the documentation as to when things happened that would affect the ground resistance of the primary neutral, and that's what gives me the engineering ability or understanding how to convert back to those earlier days.

*Id.* at 111–112.

Section 907.03, Stats.,[9] permits an expert to base an opinion or inference on facts or data "perceived by or made known to him at or before the hearing." The assertion that Mr. Winter's testimony was not based on

[9]Section 907.03, Stats. 1987–88 provides:

**907.03 Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

"first-hand knowledge" has no effect on the admissibility of his testimony. At best, it goes to the weight of his testimony.

In addition, the bases of Mr. Winter's testimony need not be admissible into evidence but must be reasonably relied upon by experts in the field in forming an opinion or inference. Section 907.03, Stats. Although Mr. Winter did not say the "magic words"—"reasonably relied upon by experts in the field," the bases for his opinion clearly are of the type experts would rely on in formulating an opinion about the existence and sources of stray voltage. So even if Mr. Winter arguably relied on hearsay in forming his opinion, his opinion is still admissible. Moreover, the "hearsay" would also be admissible for the limited purpose of serving as a basis for the opinion.[10]

As for the necessity of a hypothetical question because Mr. Winter was not testifying entirely on the basis of first-hand knowledge, this court dispensed with such a necessity in *Rabata v. Dohner,* 45 Wis. 2d 111,

---

[10]In *Bagnowski v. Preway, Inc.,* 138 Wis. 2d 241, 251–252, 405 N.W.2d 746 (Ct. App. 1987), the court of appeals, relying on sec. 907.03, Stats., held that an expert could testify that his opinion was based on an out of court statement, since this statement was of the type reasonably relied upon by experts in formulating opinions. *Id.* The court stated that it was approving of the use of the out of court statement "under another hearsay exception" and went on to discuss the application of sec. 907.03, Stats. *Id.* Section 907.03, Stats., however, is not to be confused with a "hearsay exception." To do so would be to say the hearsay is admissible and can be used by any witness for the truth of the matter asserted.

128-135, 172 N.W.2d 409 (1969). The court in *Rabata* was of the opinion that:

> The use of a hypothetical question frequently has a stultifying, somniferous, effect upon a jury and presents to them at one time so great a quantity of assumed facts that it is not reasonable to expect them to have any clear idea of the basis on which the opinion is formed.

*Id.* at 128. The court stated that it was posed with the question of:

> [W]hether this court should require as a matter of general rule that the opinions of an expert should be elicited by hypothetical questions in those cases where they have heretofore been required.

*Id.* at 129. The court adopted Rule 409 of the Model Code of Evidence which provides:

> An expert witness may state his relevant inferences from matters perceived by him or from evidence introduced at the trial and seen or heard by him or from his special knowledge, skill, experience or training, whether or not any such inference embraces an ultimate issue to be decided by the trier of fact, and he may state his reasons for such inferences and need not, unless the judge so orders, first specify, as an hypothesis or otherwise, the data from which he draws them; but he may thereafter during his examination or cross-examination be required to specify those data.

*Id.* at 133. This rule does not contemplate that the foundation for the opinion be put to the expert witness by hypothesis prior to eliciting the opinion. *Id.* The admission of Mr. Winter's testimony was not in error, and it therefore serves no basis for a new trial.

Pioneer also requests a new trial on the basis of the admission of Exhibit fifty-six over a hearsay objection. Exhibit fifty-six is a letter from the University of Wisconsin Extension—Madison, to the Wisconsin Electric Power Suppliers, and others, giving notice of a meeting to be held on September 7, 1979, regarding stray voltage. The letter is dated August 21, 1979. The Kolpins attempted to use Exhibit fifty-six to show that information on stray voltage was available to the electrical power supply industry as early as 1979. It was not used to show that Pioneer received the letter or knew of the meeting. Pioneer objected to the admission of the letter on the basis of double hearsay.

The admission of the letter, if error at all, amounts to harmless error. The letter was not used to show that Pioneer knew of the meeting and could have attended the meeting, or even failed to attend the meeting. It was offered to show that information on stray voltage was available, as early as 1979, if Pioneer had made an effort to find it. In addition, several experts testified about the availability of information on stray voltage existing sometime around 1979. In fact, Mr. Winter testified that literature on stray voltage was made available to the Institute of Electrical and Electronic Engineers (an organization that publishes and provides information to the electric industry) as early as the 1940's and 1950's.

We are not of the opinion that the jury's verdict would have been different if Exhibit fifty-six had not been admitted. Therefore, its admission, being harmless error, cannot constitute a basis for a new trial. *See generally, State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985).

■■ After considering the four errors of law alleged by Pioneer, we uphold the discretionary decision of the circuit court and conclude that there are facts of record which support the judge's decision in denying Pioneer's motion for a new trial.

We hold that under the "discovery rule," the Kolpins' claims are not time-barred. The jury's answer to special verdict question number twelve should have been "no"—the Kolpins did not discover, nor with the exercise of reasonable care should have discovered, prior to February 17, 1981, that Pioneer's electrical distribution system was a cause of damage to their dairy operation. The Kolpins have succeeded on a theory of negligence, including the causation element, and are entitled to judgment in their favor. In addition, we hold that the circuit court did not err in denying Pioneer's motions after verdict, which included judgment notwithstanding the verdict and a motion for a new trial.

*By the Court.*—The decision of the court of appeals is reversed and remanded to the circuit court with instructions to change the answer to question number 12 of the special verdict from "yes" to "no" and to reinstate the judgment in favor of the plaintiffs in the sum of one hundred thirty-three thousand, three hundred twenty-six dollars and ninety cents ($133,326.90) plus costs, including interest.