**Carl M. JERSILD and Marilyn J. Jersild, Plaintiffs,**

v.

**George E. AKER and John J. Kalfahs, Defendants.**

No. 90–C–292.

United States District Court, E.D. Wisconsin.

Sept. 30, 1991.

Ross & Stevens by Patience D. Roggensack, Madison, Wis., for plaintiffs.

Druck & Swartzberg by John G. Movroydis, Madison, Wis., for defendants.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

On March 23, 1990, the plaintiffs, Carl M. Jersild and Marilyn J. Jersild filed this action alleging securities fraud, statutory fraud, and common law fraud by the defendants George E. Aker and John J. Kalfahs. Federal jurisdiction is based upon diversity of citizenship, *see* 28 U.S.C. § 1332(a)(1), and the parties have agreed that Wisconsin law governs. On June 10, 1991, the defendants' motion for summary judgment was denied, *see Jersild v. Aker*, 766 F.Supp. 713 (E.D.Wis.1991), and the action proceeded to trial. On June 28, 1991, after a one-week trial, the jury reached a verdict awarding the plaintiffs damages of $140,348.24 against both defendants; the court directed the clerk to enter judgment in that amount.

After the trial (but before the entry of judgment), the defendants filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The plaintiffs opposed that motion and later filed a motion of their own—for statutory interest and statutory attorneys fees. The defendants subsequently filed their "objection" to the plaintiffs' motion for interest and attorneys fees. The court has addressed these motions, which overlap in scope, in a unitary decision and order.

The defendants' motion will be denied, and the plaintiffs' motion will be granted, subject to the conditions specified in this decision.

I.

The plaintiffs' various causes of action stemmed from their involvement in a single transaction in the stock of Jersild Knitting Corporation [the corporation], a closely-held corporation. At trial, the evidence

established the nature of the events relating to the stock transaction.

At the time of the transaction, one of the plaintiffs, Carl Jersild, was vice president of sales for the corporation. Mr. Jersild had been an employee of the corporation since 1960 and had been named vice president in 1984. The other plaintiff is Mr. Jersild's wife, Marilyn, who had also been employed by the corporation, in retail sales. Defendant George Aker was chairman of the board of directors of the corporation; defendant John Kalfahs was president and also a director of the corporation.

Until 1986, the corporation was essentially family-owned: defendant Kalfahs is the grandson of the founder of the corporation; defendant Aker's wife is the granddaughter of the founder. Mr. Jersild is a cousin both of defendant Aker's wife and defendant Kalfahs. At that time, the defendants (and their spouses) collectively owned 75 percent of the corporation's stock. However, the corporation had performed poorly during the mid–1980s—a time when its sales dwindled and its losses mounted. In 1986, the defendants sold 60 percent of the foundering corporation to Mill Creek Ventures of Neenah, Inc. [Mill Creek Ventures], an investment group headed by Thomas J. Hoffmaster.

Despite the infusion of capital occasioned by the investment of Mill Creek Ventures, when sales fell below projections in 1986, the corporation found itself to be in need of approximately $500,000 in additional funds to continue with its operation. In early 1987, the majority shareholder, Mill Creek Ventures, exercised its rights under a shareholder agreement and called upon defendants Aker and Kalfahs to match its proposed $300,000 cash contribution to the corporation with a $200,000 cash contribution of their own. In response, Mr. Kalfahs contributed $100,000 in cash. Conversely, Mr. Aker simply "contributed" his personal shares of the corporation's stock (a ten percent holding) to the corporation for resale in order to enable the corporation to raise $100,000. That is, Mill Creek Ventures relieved Mr. Aker of his obligation to contribute $100,000 in cash when he "gave" 150 shares of corporation stock to the corporation in February 1987. (Notably, Mill Creek Ventures could have closed the corporation if defendants Aker and Kalfahs had not come up with the required cash contribution.) Shortly afterward, in March 1987, Mr. Aker approached Mr. Jersild with the "opportunity" to purchase stock from the corporation—150 shares for $100,000—which would allow the corporation to realize indirectly the cash contribution Mr. Aker was to have made directly.

At trial, the plaintiffs endeavored to show that Mr. Aker, assisted by Mr. Kalfahs, perpetrated a fraud upon them. They sought to show that, notwithstanding the precarious financial condition of the corporation, the defendants enticed the plaintiffs to purchase the arbitrarily priced and over-valued shares by artifice, deception and misrepresentation. The evidence showed that Mr. Jersild might have been an easy mark, because of his obvious enthusiasm to gain an ownership interest in the corporation. At trial, Mr. Jersild confessed that he was "flattered" with the invitation to become a stockholder. Nevertheless, the defendants' flattering invitation was, the evidence showed, accompanied with statements and conduct that the defendants affected with the intention of giving the plaintiffs the impression that all was well at the corporation.

All was not well. The corporation's certified public accountants had only days before, on February 27, 1987, issued an opinion, based upon preliminary balance sheets, showing the corporation then to have a *net* worth of $76,798.19. Mr. Aker admitted that the corporation's accountants had valued the corporation at $76,798.19 at the end of 1986. Notably, there was no evidence to show that the "market value" of a ten percent holding in the corporation was $100,000. In fact, the most convincing evidence revealed that the defendants' professed value of the shares had no relation to the actual worth of the corporation. While it may be true that ascertaining the "market value" of the shares of a closely-held corporation requires complex—and perhaps subjective—financial analysis, the evidence strongly suggested that the de-

fendants found their valuation of the corporation's stock sold to the plaintiffs to be an overly-simplistic task. The $100,000 figure that the plaintiffs paid for the shares directly related to the amount of the then—unfulfilled cash call looming over Mr. Aker.

The evidence relating to the extent of Mr. Jersild's knowledge of the ill financial health of the corporation at the time he and his wife purchased the stock was sharply conflicting. There was no dearth of evidence showing that Mr. Jersild should have thought twice before accepting the defendant's invitation to invest in the corporation. The evidence demonstrated that Mr. Jersild, as vice president of sales, was not without access to significant information about the financial health of the corporation; his position, at the very least, unavoidably revealed to him the corporation's unspectacular sales performance. (Sales were the corporation's primary income source.) In addition, there was evidence to suggest that Mr. Jersild consulted with the corporation's accountants as he pondered Mr. Aker's invitation to purchase the corporation's stock. There was also testimony that the accountants, and other persons, had warned the plaintiffs of the financial risk posed by Mr. Aker's invitation. Thus, there was at least some substantial evidence to suggest that Mr. Jersild had conducted his own economic analysis of the corporation, based on his own general knowledge, as he decided whether to purchase the stock, and that the plaintiffs ultimately disregarded the risks known to them. Notably, the evidence showed that the plaintiffs deliberated their investment decision over the period of several weeks.

The defendants endeavored to persuade the jury that the plaintiffs were overcome by their enthusiasm and optimism about gaining a substantial ownership stake in the corporation, despite their awareness of the corporation's ill financial health. The defendants also endeavored to show that the plaintiffs purchased the stock for other reasons than as a direct financial investment. The plaintiffs both testified to their hope to gain a stake in the "family" business that bore their name. Mr. Jersild also acknowledged that one of his motivations for purchasing stock in the corporation was to assure the board of directors of his loyalty and commitment. Moreover, there was at least some evidence that Mr. Hoffmaster, who headed Mill Creek Ventures, was not completely satisfied with Mr. Jersild's work performance (and had made that point clear to Mr. Jersild), that Mr. Jersild was aware that Mr. Hoffmaster could have fired him, and that Mr. Hoffmaster would be pleased to learn that Mr. Jersild had made an investment in the corporation.

On the other hand, Mr. Jersild was shown to be limited in his education in financial matters and testified as to his patent lack of familiarity with matters of corporate finance. He also testified that he then had little knowledge of the actual financial condition of the corporation, including its debt, notwithstanding his lofty corporate title. The evidence showed that the defendants and Mill Creek Ventures jealously guarded the access to corporate financial information that might have influenced Mr. Jersild's investment decision. Mr. Jersild testified that he was never permitted access to detailed financial records of the corporation, and, although he was a corporate officer and regularly attended board meetings, he was excused when certain financial matters were discussed. Other testimony supported the plaintiffs' assertion that defendants Aker and Kalfahs treated Mr. Jersild as an outsider and were not responsive to his requests for financial information about the corporation. Thus, there was strong and credible evidence that the plaintiffs, overly enthusiastic and optimistic and not having been made privy to at least some significant information regarding the financial condition of the corporation, had been unwittingly duped by the defendants into purchasing at an 6 27 inflated price the shares that Mr. Aker "gave" back to the corporation.

It was undisputed that on March 31, 1987, Mr. Jersild paid $100,000 for 150 shares of the corporation's stock, a ten percent holding. It was also undisputed that the corporation's financial performance faltered through 1987 until September

1988, when Mill Creek Ventures closed the corporation. When that happened, the plaintiffs lost their entire investment.

## II.

The plaintiffs asserted that the stock they purchased was worthless *when* it was purchased and that the defendants had perpetrated a fraud upon them. In particular, the plaintiffs claimed that each defendant's conduct ran afoul of the Wisconsin securities laws, *see* Wis.Stat. § 551.59(1)(a) (prohibiting fraud in connection with the sale of securities as described in Wis.Stat. § 551.41), and Wisconsin consumer protection laws, *see* Wis.Stat. § 100.18 (prohibiting, among many other things, fraudulent representations in the marketing and sale of goods and services, including securities). In addition, the plaintiffs charged the defendants with having made intentional misrepresentations, actionable under Wisconsin common law, *see Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 25, 288 N.W.2d 95 (1980).

The evidence presented in support of and in defense of these claims posed genuine factual issues, *see* 766 F.Supp. at 721, which the jury undertook to resolve. Ultimately, the jury resolved the disputed factual issues in favor of the plaintiffs. The jury concluded that each defendant had, albeit to a varying degree, intentionally misrepresented facts that would have affected the plaintiffs' decision to purchase the corporation's stock—that the defendants had unlawfully capitalized on their informational advantage over the plaintiffs.

Specifically, the jury found in favor of the plaintiffs and against defendant Aker on the intentional misrepresentation (common law fraud), statutory fraud, and securities fraud claims; the jury also found in favor of the plaintiffs and against defendant Kalfahs on the statutory fraud and securities fraud claims. In response to a single interrogatory in the special verdict form, the jury determined that the plaintiffs had suffered damages in the amount of $140,348.24. Although invited by the verdict form to consider the question, the jury made no award of punitive damages against either defendant.

## III.

The defendants have moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. With the motion was a supporting memorandum, which contains the following assertions: (1) that the court's decision to allow the admission of evidence of the financial condition of the defendants was erroneous; (2) that the court's instruction that one person can be "the public" under Wis.Stat. § 100.18(1) was erroneous; (3) that the plaintiffs' claim against defendant John J. Kalfahs under Wis.Stat. § 551.59 is barred as a matter of law because they did not present him with a "tender letter"; (4) that the plaintiffs were entitled only to pre-judgment interest at the legal rate under Wis.Stat. § 551.59; and (5) that the plaintiff "misled and confused" the jury resulting in a "perverse" verdict.

Wisconsin law governs the defendants' motion for judgment notwithstanding the verdict in this diversity action, *see Krist v. Eli Lilly and Co.*, 897 F.2d 293, 296 (7th Cir.1990). Under Wisconsin law, a motion for judgment notwithstanding the verdict "admits for the purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted the moving party on grounds other than those decided by the jury." *Kolpin v. Pioneer Power & Light Co.*, 162 Wis.2d 1, 28, 469 N.W.2d 595 (1991) (citations omitted); *see also* Wis.Stat. § 805.14(5)(b). Conversely, the defendants' motion for a new trial is governed by federal law, *see, e.g., Babb v. Minder*, 806 F.2d 749, 752 (7th Cir.1986); *Robison v. Lescrenier*, 721 F.2d 1101, 1104 (7th Cir.1983). A motion for a new trial should be granted only if the verdict is against the weight of the evidence, the damages are excessive, or the trial was unfair to the movant for some other reason. *See, e.g., Fleming v. County of Kane*, 898 F.2d 553, 559 (7th Cir.1989).

The defendants have not correlated the various contentions underlying their motion

to the applicable legal standards. Nevertheless, the court is satisfied that if the findings of the jury's verdict are sustained, as called for under Wisconsin law, the defendants' motion for a judgment notwithstanding the verdict cannot be sustained; the defendants have suggested no plausible grounds to require the entry of a judgment contrary to the verdict. As there is no occasion to upset the jury's factual determination that the defendants perpetrated a fraud on the plaintiffs, that motion will be denied.

Furthermore, as the court's review of the defendants' various contentions will demonstrate, the defendants have failed to establish either that the verdict was against the weight of the evidence, that the damages were excessive, or that there was any unfairness that calls for a new trial. The court will deny the alternative motion for a new trial, as well.

#### A.

■ The defendants' initial contention is that the court erred when it refused to bar the plaintiffs from introducing evidence of the personal wealth of the defendants. The matter was raised in a motion in limine filed on the eve of trial, and the court issued its ruling at the onset of the trial. The court refused to bar the admissibility of evidence of each defendant's personal wealth because the action appeared to be one in which the jury would be asked to decide whether to award punitive damages.

As they did at trial, the defendants cite *Meke v. Nicol*, 56 Wis.2d 654, 203 N.W.2d 129 (1973), for the proposition that when punitive damages are sought against two defendants a court may not admit evidence of the personal wealth of any one of the defendants. At trial, the court found *Meke* to be distinguishable from the present action; instead, the court looked to two cases that had been decided after *Meke: Fahrenberg v. Tengel*, 96 Wis.2d 211, 291 N.W.2d 516 (1980); *Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677 (1985). In both *Fahrenberg* and *Brown*, the Wisconsin supreme court noted that the personal wealth of a defendant was a relevant factor for

the jury to examine as it contemplated an award of punitive damages. Accordingly, the court determined it proper to admit the evidence.

Correspondingly, the form of the special verdict was altered to avoid the prejudicial error disclosed in *Meke*. In *Meke*, the jury was asked to consider a single collective award of punitive damages against two defendants (one wealthy, the other impecunious) who were jointly and severally liable. In this action, the jury was asked to consider separately whether each defendant should be assessed with punitive damages, and, if so, in what amount each should be assessed. This arrangement obviated the flaw identified in *Meke*—that the wealth of one defendant would affect the award of punitive damages for which the other defendant would jointly and severally share responsibility.

■ Practically speaking, it would be a gross overstatement to say that the plaintiffs made unfair advantage of the court's ruling. Interestingly, the defendants have specifically identified—and only in their reply brief—but one piece of offending evidence that made its way into the trial record: a federal income tax return demonstrating that defendant Aker had a salary of approximately $113,000 in 1987. *See* Plaintiffs' Exhibit 21. (Notably, that exhibit was also used for an *unquestionably* legitimate purpose: to show that defendant Aker had sought a tax deduction for his $100,000 stock "gift" to the corporation.) At all events, the jury declined to award punitive damages against either defendant, *cf. Meke*, 56 Wis.2d at 658–59, 203 N.W.2d 129 (reversing jury award of "joint and several" *punitive* damages).

The court is satisfied that the matter was resolved in conformity with Wisconsin law and, irrespective of that, the defendants have failed to show any unfair prejudice.

#### B.

■ Both defendants were found to have violated a statute assessing civil liability for fraudulent representations made in connection with the marketing of goods and services (including securities), Wis.Stat.

§ 100.18(1). Among other things, § 100.-18(1) prohibits persons from inducing "the public" to purchase securities by making "a representation or statement of fact which is untrue, deceptive or misleading." At the close of the trial, during the course of its instructions to the jury, the court noted that one person could be "the public" for purposes of § 100.18(1). The defendants, who did not object at the time, now do.

Notwithstanding their failure to object at trial, the defendants cannot be heard to say that the court's instruction on this point took them by surprise. The court had previously stated the proposition weeks before trial in its decision and order denying the defendants' *motion for summary judgment, see* 766 F.Supp. at 717. While it is true that the corporation's stock was not "publicly held," the evidence suggested that the stock would be made available to selected members of the public. Notably, it was Mr. Aker's testimony at trial that he intended to invite persons other than Mr. Jersild to purchase the stock.

■ More importantly, the defendants cannot question the validity of the stated proposition—one person can, indeed, constitute "the public" for purposes of § 100.18, *see State v. Automatic Merchandisers, Inc.,* 64 Wis.2d 659, 664, 221 N.W.2d 683 (1974) (§ 100.18 construed to apply to factual representations made in private conversations to individual private purchasers). While the readily apparent legislative goal underlying the enactment of § 100.18 is to protect *all* members of public from fraudulent advertisements and deceptive marketing practices, in its practical application, the section individually protects *each* member of the public.

However, the defendants also contend that the effect of the court's instruction was to remove an element of factual proof relating to the alleged offense from the consideration of the jury. That is not a fair characterization of the court's instruction. The instruction—that as a matter of law, one person *could* be the public—did not deprive the jury of its prerogative to decide that the present plaintiffs were not in fact members of the public within the protections of § 100.18(1) vis-a-vis the present defendants.

In my opinion, the instruction to the jury was neither improper nor unfair to the defendants.

**C.**

■ Defendant John J. Kalfahs individually contends that the plaintiffs' claim against him under the Wisconsin securities laws, Wis.Stat. § 551.59, is barred because the plaintiffs never demonstrated that a "tender letter" had been presented to him. (Defendant Aker *was* presented with such a letter.) Interestingly, Mr. Kalfahs did not raise the matter on his motion for summary judgment, nor did he press this matter on his motion for directed verdict.

A review of the relevant subsection of § 551.59 suggests why: there is no such requirement listed. It is true that another section of the statute—inapplicable here—bars a prospective plaintiff from bringing suit where the prospective *defendant* has made a tender offer, *see* Wis.Stat. § 551.-59(6). It is also true that, as a matter of course, prospective securities fraud plaintiffs would be well-advised to offer to tender the offending shares before bringing suit. However, there was no such statutory precondition for this action (which was brought under § 551.59(1) and not § 551.59(6)). Therefore, the court finds no merit in defendant Kalfahs' contention.

**D.**

The defendants next contend that the effect of the jury's verdict was to award the plaintiffs pre-judgment interest at a rate greater than the legal rate, *see* Wis. Stat. § 138.04. The jury awarded the plaintiffs compensatory damages of $140,-348.24, although there was no dispute that the amount of the alleged fraud was precisely $100,000. The defendants suggest that the plaintiffs "were awarded interest by the jury commensurate with the plaintiff's [sic] damage schedule which was based on plaintiff's [sic] mortgage interest rate." (The "damage schedule" to which the defendants refer is Plaintiffs' Exhibit

25, which was received into evidence over the defendants' objection. *See* Appendix A.) The defendants also contend that the plaintiffs' pending motion for pre-judgment interest on the verdict is an attempt to duplicate what the jury has already awarded.

Viewed in the light most favorable to the plaintiffs, the evidence demonstrated that the defendants induced the plaintiffs to purchase 150 shares of stock by representing the value to be $100,000—the purchase price; in reality, the shares were worthless. The plaintiffs paid $100,000 for those shares and totally lost their investment afterward when the corporation closed. That sum represents the plaintiffs' direct damages.

The evidence also demonstrated that the plaintiffs took out a loan—a promissory note (secured by a mortgage on their home)—to fund their investment in the worthless stock. That is, the remaining $40,348.24 of the jury's damage award, as denominated in Plaintiffs' Exhibit 25, is interest at the rate the plaintiffs were actually required to pay on the promissory note (along with $1,555 in closing costs on the mortgage securing the note). That sum represents an additional amount of money the plaintiffs have lost indirectly as a consequence of their purchase of worthless stock. Accordingly, the plaintiffs contend that nothing less than the jury's award of $140,348.24, which reflects the total amount of their pecuniary—direct and indirect or consequential—loss will make them whole for the injury they claimed to have incurred.

■ This case calls for the court to ascertain the nature of a defrauded party's entitlement to damages under Wisconsin law. On an intentional misrepresentation claim, the typical measure of damages is determined by the "benefit of the bargain" rule: "the difference between the value of the property as represented and its actual value." *Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 52–53, 288 N.W.2d 95 (1980). However, in *Ollerman*, the Wisconsin supreme court acknowledged the need for flexibility in the determination of the appropriate damage measure:

> The damages necessary to give the purchaser the benefit of the bargain will depend on the nature of the bargain and the circumstances of each case.... The purchaser may recover for indirect or consequential damages caused by the misrepresentation in addition to or in lieu of direct damages.

*Ollerman*, 94 Wis.2d at 53, 288 N.W.2d 95 (footnotes omitted). A review of Wisconsin law convinces me that it would be error to *deprive* defrauded parties of indirect or consequential damages, if proved by credible evidence to a reasonable certainty and if not duplicative of direct damages. *See, e.g., Gyldenvand v. Schroeder*, 90 Wis.2d 690, 699–700, 280 N.W.2d 235 (1979) (negligent misrepresentation); *Costa v. Neimon*, 123 Wis.2d 410, 417–18, 366 N.W.2d 896 (Ct.App.1985). Under Wisconsin law, the defrauded party is to be made "whole"—to be accorded "complete relief." *Head & Seeman, Inc. v. Gregg*, 104 Wis.2d 156, 161, 311 N.W.2d 667 (Ct.App.1981), *aff'd per curiam*, 107 Wis.2d 126, 318 N.W.2d 381 (1982) (adopting opinion of court of appeals). *See also Schnuth v. Harrison*, 44 Wis.2d 326, 339, 171 N.W.2d 370 (1969) (upholding a jury award of all items of damages "aimed at making the [defrauded party] whole and ... needed to place him in the same position he was before the contract").

■ The same is true for § 100.18. On a successful § 100.18(1) claim, the defrauded party is entitled to recover the "pecuniary loss" caused by the misrepresentation, as specified in Wis.Stat. § 100.18(11)(b)2. Given the remedial purpose of § 100.18 (and absent contradictory Wisconsin authority), the court is compelled to provide the term "pecuniary loss" a broad construction—requiring consideration both of direct and ascertainable indirect or consequential damages as necessary to make the defrauded party "whole."

This case also poses the additional (and more difficult) question of whether the Wisconsin supreme court would permit interest payments incurred by the defrauded

party as a consequence of a misrepresentation to be recovered as indirect or consequential damages, if not duplicative of direct damages. Although the Wisconsin supreme court has not issued a specific pronouncement to this effect, I believe that the Wisconsin supreme court *would* do so, if faced with the question (as a number of *unpublished*, hence unauthoritative, decisions of the Wisconsin court of appeals suggest). *Cf. Hill v. International Harvester Co.*, 798 F.2d 256, 260–61 n. 12 (7th Cir.1986); *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Insurance Group*, 750 F.2d 619, 624 (7th Cir.1984). The court is satisfied that Wisconsin law governing both intentional misrepresentation and § 100.18 claims would permit a defrauded party to recover, as one variety of indirect or consequential damages, actual interest payments incurred as a result of the misrepresentations, if proved with the requisite level of certainty and to the satisfaction of the trier of fact.

This conclusion is founded on the distinction between "conventional" pre-judgment interest and interest proved to be an item of consequential damages. The latter is subject to the jury fact-finding process, *cf. Schnuth v. Harrison*, 44 Wis.2d 326, 339, 171 N.W.2d 370 (1969); the former is a question of law for the court, *see Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 438–39, 265 N.W.2d 513 (1978). (Moreover, the latter is recoverable at the rate incurred, subject to the doctrine of mitigation of damages, while the former is generally recoverable only at the legal rate.)

In this case, the plaintiffs endeavored to prove that recovery of the interest they paid on the promissory note (secured by the mortgage on their home), which had been used to fund the stock purchase was an item of their consequential damages, was necessary to place them where they were before the fraud was perpetrated. The jury was thus invited to consider the interest the plaintiffs paid on the note as consequential damages. Such interest payments were distinct from—not duplicative of—the underlying amount paid for the worthless stock. Further, the interest obligation was shown to be a "consequence" of the defendants' misrepresentations because the plaintiffs would not have mortgaged their home had they not been inveigled into the purchase of the worthless stock. Moreover, the plaintiffs' "damage schedule," which the defendants never endeavored to impeach, precisely calculated the total amount of interest payments made by the plaintiffs—and obviated jury speculation, *cf. Pleasure Time, Inc. v. Kuss*, 78 Wis.2d 373, 387, 254 N.W.2d 463 (1977).

The plaintiffs convinced the jury that fair and reasonable recompense for the misrepresentations called for an award consisting both of direct damages and indirect or consequential damages: the actual amount of the fraud ($100,000) and the total interest payments at the *actual rate* the plaintiffs were obligated to pay ($40,348.24). Accordingly, the jury found that the plaintiffs' total compensable loss was $140,-348.24. Nevertheless, because the plaintiffs' intentional misrepresentation claim was successful only against defendant Aker, it is he alone who is liable for the damage award relating to that particular claim. On the plaintiffs' successful claim under § 100.18(1), both defendants are jointly and severally responsible for satisfying the jury's total damage award of $140,348.24.

Under § 551.59(1)(a), the measure of damages is defined precisely as "the consideration paid for the security, together with interest at the legal rate under [Wis.Stat. § ] 138.04 from the date of payment, and reasonable attorney fees...." While that section would entitle the plaintiffs to their total purchase price for the worthless stock, it contemplates only "conventional" pre-judgment interest. That is, any interest award must be made by the court and calculated at *the legal rate* specified in Wis.Stat. § 138.04 (5 percent). Section 551.59(1)(a) does not admit an interpretation that would also permit the defrauded party to recover any indirect or consequential damages.

Thus, on their successful § 551.59 claim, the plaintiffs are entitled to no more than the consideration paid for the worthless

stock ($100,000) plus interest on that sum calculated at the legal rate specified in Wis.Stat. § 138.04, accruing from the date of purchase, March 31, 1991, until July 9, 1991, the date when the court entered its judgment. That interest has been calculated to be $21,369.86. Originally, the judgment on this claim was entered in the amount of $140,348.24. However, the judgment on that claim must be reduced to $121,369.86 (consideration paid plus statutory pre-judgment interest at the legal rate) to conform to the language of § 551.-59(1)(a). As the plaintiffs have acknowledged the propriety of this reduction in their brief in support of their motion for statutory pre-judgment interest, remittitur is unnecessary.

Since the plaintiffs will have a joint and several judgment for that greater sum ($140,348.24) under their § 100.18 claim, it is perhaps academic that they now will also have a joint and several judgment for a lesser sum ($121,369.86) for their § 551.59 claim. The plaintiffs will be entitled to a single recovery of the greater sum authorized in the judgment, plus costs and attorney fees.

### E.

■ The defendants' final contention smacks of a generalized gripe that the trial was unfair. The defendants argue that the composition of the jury panel was unfair—that the jury did not comprehend the true nature of the case. This contention is meritless.

As to the improvident composition of the jury, the court notes that this is the first time the matter has been raised, there being no such objection made at trial. Accordingly, even if the matter had any merit, which it most assuredly does not, it could be put to rest with little discussion.

In their brief, the defendants hyperbolically liken the trial to the "Salem Witch Trials." Ostensibly, they suggest that any jury panel not composed exclusively of business school graduates was unfit to hear the case. Moreover, they deem the plaintiffs' straightforward and fact-based presentation of a relatively simple theory of liability a "flagrant abuse of our jury system and an aberration of the quest for truth and justice" under "the rhetoric of trial advocacy." Stripped of its rhetoric, the defendants' argument is nothing more than a claim that the plaintiffs "misled and confused" the jury with the *facts*.

Regrettably, counsel for the defendants chose to contact the foreperson of the jury after the trial had concluded in an effort to substantiate this argument. It appears that counsel has directly violated the strictures of Local Rule 8, Section 8.06, which expressly prohibits such post-trial contacts between counsel and the discharged jurors, absent leave of the court, which was not even requested.

Irrespective of the defendants' post-trial complaints, the court is satisfied that the jury was competent and that it faithfully discharged its sworn duty to hear the evidence and render a just verdict. The defendants' brief contains a lengthy exposition of what seems to be a complicated theory of non-liability. This theory should have been explained to the jury during the trial—not to the court in a post-trial brief. To the extent that the defendants' theory was not explained then, it is too late for it to be raised by the defendants now. Both parties had an *unlimited* opportunity to present their evidence to the jury. See *McKnight v. General Motors Corp.*, 908 F.2d 104, 115 (7th Cir.1990). When the parties had completed their respective presentations, the jury was instructed on the law and called upon to consider that evidence. That marked the defendants' point of no return.

I believe that the trial was perfectly fair and that the verdict is entirely consistent with the evidence.

### IV.

Having prevailed at trial, the plaintiffs now, by motion, claim an entitlement to

what they term "statutory interest and statutory attorney fees," citing Wis.Stat. §§ 100.18(11)(b)2. and 551.59. The motion will be granted, subject to certain conditions.

#### A.

■ The plaintiffs are correct that the cited statutory sections (the securities fraud statute, Wis.Stat. § 551.59(1)(a), and the consumer protection statute, Wis.Stat. § 100.18(11)(b)2.) authorize the court to award them, as defrauded parties, their "reasonable attorney fees." *See also Criticare Systems, Inc. v. Sentek, Inc.,* 159 Wis.2d 639, 651, 465 N.W.2d 216 (Ct.App. 1990) (existence of securities law violation mandates award of attorney fees). However, their motion demands

> an Order directing that the bill of Ross & Stevens, S.C. of $80,722.43, less all amounts taxed as costs by the Clerk of Courts [sic], shall be found fair and reasonable and added to the judgment that plaintiff shall have against defendants, pursuant to § 100.18(11)(b)2. and § 551.-59, Wis.Stats.

In support of their request for attorneys fees (which fees amount to approximately $75,000 of the total $80,722.43 figure for fees and costs), the plaintiffs have favored the court with little more than their billing records and affidavits conclusorily attesting to the reasonableness of the billing rates and hours expended.

That is, the plaintiffs have simply submitted their *actual* attorneys fees without any genuine attempt to prove the *reasonableness* of those fees. They have not discharged their duty, under Wisconsin law, to demonstrate the reasonableness of the fees. *Standard Theatres v. Wisconsin Department of Transportation,* 118 Wis.2d 730, 748, 349 N.W.2d 661 (1984); *see also Milwaukee Rescue Mission, Inc. v. Redevelopment Authority of the City of Milwaukee,* 161 Wis.2d 472, 468 N.W.2d 663 (1991). (Of course, the defendants are not of much help either. They simply term the fee request "excessive," without en-

lightening the court with any further explanation.)

The result is that the task of ascertaining a "reasonable" attorney fee has been left completely to the court. The court has carefully examined that matter and concludes that the plaintiffs' fee request (of approximately $75,000 in a fraud action where the compensatory damages sought were approximately $140,000) is *not* prima facie reasonable, and calls for closer scrutiny. The court is of the opinion that, irrespective of their confidence of ultimate success on the theories they pursued (and the corresponding prospect of recovering their *reasonable* fees), the plaintiffs' counsel is not entitled to an award of *all* fees charged to the client.

In its attempt to determine a reasonable fee award, the court finds it necessary to reduce slightly the number of hours billed by the plaintiffs' attorneys and assistants. The number of hours billed by senior attorneys has been reduced from 341.85 to 300. In addition, the number of hours billed by junior attorneys has been reduced from 34.55 to 30, for senior legal assistants from 213.10 to 170, and for law clerks from 76.75 to 60. These allotted time expenditures are deemed reasonable given the nature, duration, and complexity of the case. Moreover, the court has found it necessary to adjust the hourly billing rates for those persons. In the application of its years of experience in the local legal community, the court determines $120.00 for senior attorneys, $90.00 for junior attorneys, $60.00 for paralegals and senior legal assistants, and $40.00 for law clerks and junior legal assistants to be appropriate hourly rates. Based upon these determinations of reasonable expenditures of time and reasonable hourly rates, the court finds $51,300.00 to be a reasonable attorney fee award. Judgment will be entered accordingly.

#### B.

■ Post-judgment interest is awarded as a matter of course under federal statute, *see* 28 U.S.C. § 1961(a); thus what the

plaintiffs term "statutory interest" in their motion will be viewed as *pre*-judgment interest. It is true that, under Wis.Stat. § 551.59(1)(a), the plaintiffs are entitled to "the consideration paid for the security, together with interest at the legal rate under [Wis.Stat. § ] 138.04 from the date of payment...." However, the court is also mindful of the fact that the plaintiffs have *already* been awarded "interest" as one aspect of the jury's total $140,348.24 compensatory damage award. To the extent that the plaintiffs now seek "conventional" pre-judgment interest on *that* sum, which already includes interest as consequential damages relating to the intentional misrepresentation and § 100.18 claims, the court is in complete agreement with the defendants' contention that the plaintiffs are improperly seeking a double recovery.

For that reason, the pre-judgment interest entitlement need only be explored in connection with the plaintiffs' § 551.59 claim. As specified in § 551.59(1)(a), the plaintiffs will be awarded to their total purchase price for the worthless stock, plus interest at *the legal rate* specified in Wis. Stat. § 138.04. (5 percent). It is undisputed that the plaintiffs paid $100,000—no more, no less—for the stock; that was the total consideration paid. The pre-judgment interest calculation contemplated by § 551.-59(1)(a) is based on "the consideration paid for the security." Interest accrues from the date of purchase, March 31, 1991, until July 9, 1991, the date when the court entered final judgment. The sum, noted earlier in this decision, is $21,369.86.

### ORDER

Therefore, IT IS ORDERED that the defendants' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial be and hereby is denied.

IT IS ALSO ORDERED that the judgment in this action entered on July 9, 1991, be and hereby is vacated.

IT IS FURTHER ORDERED that the plaintiffs' motion for statutory interest and statutory attorney fees be and hereby is granted, subject to the conditions specified in this decision.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment on the plaintiffs' common law intentional misrepresentation claim in the amount of $140,348.24, plus costs, in favor of the plaintiffs and against defendant George E. Aker.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment on the plaintiffs' Wis.Stat. § 100.18 claim in the amount of $140,-348.24, plus costs, in favor of the plaintiffs and against defendants George E. Aker and John J. Kalfahs, jointly and severally.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment on the plaintiffs' Wis.Stat. § 551.59(1)(a) claim in the amount of $100,-000, plus pre-judgment interest of $21,-369.86, plus costs, in favor of the plaintiffs and against defendants George E. Aker and John J. Kalfahs, jointly and severally.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment in the amount of $51,-300.00, which amount represents a reasonable attorney fee as determined by the court, in favor of the plaintiffs and against defendants George E. Aker and John J. Kalfahs, jointly and severally.

IT IS FURTHER ORDERED that the clerk of court shall enter a full satisfaction of this entire judgment upon proof of payment to the plaintiffs, by one or both of the defendants, of the sum of $140,348.24, plus costs and attorney fees.

IT IS FURTHER ORDERED that John Movroydis, the defendants' trial counsel, be and hereby is directed to show cause, in writing, no later than October 18, 1991, why he should not be disciplined for violating Local Rule 8, Section 8.06.

APPENDIX A
PLAINTIFFS' EXHIBIT 25

DAMAGES

CARL AND MARILYN JERSILD, PLAINTIFFS

1. INTEREST PAID:

| | A | B | C |
|---|---|---|---|
| PROMISSORY NOTE TERM | INTEREST | TAX BENEFIT | TOTAL |
| 3/31/87– 4/1/88 | $ 8,721.62 | None | $ 8,721.62 |
| 4/1/88– 3/31/89 | 8,718.82 | None | 8,718.82 |
| 4/1/89– 3/31/90 | 10,430.34 | None | 10,430.34 |
| 4/1/90– 3/31/91 | 9,444.34 | None | 9,444.34 |
| 4/1/91– 6/30/91 | 1,478.12 | None | 1,478.12 |
| | $38,793.24 | | $ 38,793.24 |

2. AMOUNT PAID FOR JERSILD STOCK: $100,000.00

3. CLOSING COSTS ON 3/31/87 MORTGAGE: $  1,555.00

TOTAL DAMAGES: $140,348.24